UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding in a Criminal Term

Grand Jury Sworn in on September 30, 2004

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. **05-386 (ESH)** |
| | : | |
| v. | : | GRAND JURY ORIGINAL |
| | : | |
| **ANTOINE JONES,** | : | VIOLATIONS: 21 § U.S.C. §846 |
| **also known as "Toine,"** | : | (Conspiracy to Distribute and Possess With |
| **DEMETRIS JOHNSON,** | : | Intent to Distribute 5 Kilograms or More of |
| **ADRIAN JACKSON,** | : | Cocaine and 50 Grams or More of Cocaine |
| **MICHAEL HUGGINS,** | : | Base); |
| **KEVIN HOLLAND,** | : | 21 U.S.C. §841(a)(1) and §841(b)(1)(B)(ii) |
| **ALBERTO ROLANDO CARRILLO-** | : | (Unlawful Possession With Intent to Distribute |
| **MONTELONGO,** | : | 500 Grams or More of Cocaine); |
| **ROEL BREMEA, JR.,** | : | 21 U.S.C. §841(a)(1) and §841(b)(1)(C) |
| **RICARDO SANCHEZ-GONZALEZ,** | : | (Unlawful Possession With Intent to Distribute |
| **LAWRENCE MAYNARD,** | : | Cocaine); |
| **KIRK CARTER,** | : | 18 U.S.C. §924(c)(1)(A)(ii) |
| **Defendants.** | : | (Using, Carrying, Brandishing, and Possessing |
| | : | a Firearm During a Drug Trafficking Offense) |
| | : | 18 U.S.C. §2 |
| | : | (Aiding and Abetting) |

**SUPERSEDING INDICTMENT**

The Grand Jury charges that:

**COUNT ONE**

**NARCOTICS CONSPIRACY**

**A. THE CONSPIRACY**

From at least sometime in 2003, the exact date being unknown to the Grand Jury, up to and including October 24, 2005, in the District of Columbia, the State of Maryland, the State of Texas, the State of North Carolina, and elsewhere, the defendants, **ANTOINE JONES, also known as**

**Toine**, **(hereinafter "JONES"), DEMETRIS JOHNSON (hereinafter "JOHNSON"), ADRIAN JACKSON (hereinafter "JACKSON"), MICHAEL HUGGINS (hereinafter "HUGGINS"), KEVIN HOLLAND (hereinafter "HOLLAND"), ALBERTO ROLANDO CARRILLO-MONTELONGO (hereinafter "CARRILLO-MONTELONGO"), ROEL BREMEA, JR. (hereinafter "BREMEA"), RICARDO SANCHEZ-GONZALEZ (hereinafter "SANCHEZ-GONZALEZ"), LAWRENCE MAYNARD (hereinafter "MAYNARD),** and **KIRK CARTER (hereinafter "CARTER"),** did knowingly and willfully combine, conspire, confederate and agree together and with other persons both known and unknown to the Grand Jury, to unlawfully, knowingly and intentionally distribute and possess with intent to distribute the following:

    a) a mixture and substance containing a detectable amount of cocaine, a schedule II narcotic drug controlled substance, and the amount of said mixture and substance was 5 kilograms or more, in violation of Title 21 United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii);

    b) a mixture and substance containing a detectable amount of cocaine base, in the form of "crack," a schedule II narcotic drug controlled substance, and the amount of said substance was 50 grams or more, in violation of Title 21, United State Code, sections 841(a)(1) and 841(b)(1)(A)(iii).

**B. GOALS OF THE CONSPIRACY**

    It was the principal goal of the conspiracy that, in order to obtain as much money and other things of value as possible, the defendants, and co-conspirators not indicted herein, both known and unknown to the Grand Jury, acquired, repackaged, stored, processed, sold, and redistributed quantities of cocaine and cocaine base in the District of Columbia, the State of Maryland, the State of Texas, the Republic of Mexico, and elsewhere.

**C. MANNER AND MEANS TO EFFECTUATE THE CONSPIRACY**

1. The members of the conspiracy played various and interchangeable roles based upon the needs of the conspiracy. **JONES** was the primary supplier of cocaine and cocaine base to members of the organization in the District of Columbia and the State of Maryland.

2. **JOHNSON, JACKSON, HUGGINS, HOLLAND, CARTER,** and others known and unknown to the Grand Jury, obtained cocaine from **JONES**. They in turn repackaged it in smaller amounts for redistribution to others. At other times, they redistributed the cocaine in kilogram form. They frequently processed the cocaine they obtained from **JONES** into crack cocaine before it was redistributed. And, on some occasions, **JONES** would supply crack cocaine to these co-conspirators directly.

3. **MAYNARD** assisted **JONES** in furthering the activities of the conspiracy in a number of ways including, but not limited to, the following: distributing cocaine for **JONES;** providing security for **JONES** by accompanying him to deliver cocaine and to collect payment for the drugs; assisting **JONES** in obtaining large quantities of cocaine from **JONES's** suppliers; facilitating contact between **JONES** and his suppliers; and renting and maintaining houses used for the storage and packaging of cocaine and money (hereinafter "stash locations").

4. **JONES** was supplied with cocaine by various individuals, including persons he identified as "the Mexicans." These suppliers, including **BREMEA**, and others known and unknown to the Grand Jury, located in the State of Maryland, the State of Texas, and the Republic of Mexico, periodically supplied **JONES** with large quantities of cocaine. At times, these suppliers were assisted in their distribution activities by others, including **CARRILLO-MONTELONGO** and **SANCHEZ-GONZALEZ.**

5. On some occasions, **JONES** and/or **MAYNARD** traveled out of the area to pick up the cocaine from the suppliers, and to deliver cash payment for the cocaine. On other occasions, the suppliers traveled to the Washington, D.C., area, to deliver large quantities of cocaine to stash locations where it was given to **JONES**, and to collect money from **JONES** and/or **MAYNARD**. In furtherance of this business relationship with their Mexican suppliers, **JONES** and **MAYNARD** rented houses, apartments, and other locations in the Washington, D.C., area, where **BREMEA** and others stored their cocaine. The suppliers also stored in these stash locations large amounts of cash that **JONES** delivered to them in payment for cocaine, which they ultimately transported to Mexico. For example, on November 11, 2003, **JONES** rented for a period of six months an apartment located at 9719 Summit Circle, Apartment 3B, Largo, Maryland, for this purpose. And on January 10, 2004, **MAYNARD** rented for a period of six months a house located at 8550 Myrtle Avenue, Bowie, Maryland, for the same purpose. On February 27, 2004, a warrant-based search of 8550 Myrtle Avenue revealed several empty duffel bags, heat seal machines, heat seal wrappers, and rubber bands, along with a few air mattresses on the floor, but little additional furniture. On occasion, the suppliers themselves rented houses in the Washington, D.C., area, for the same purpose, after **JONES** grew tired of renting these locations for use by his suppliers.

6. From time to time, **BREMEA, CARRILLO-MONTELONGO, SANCHEZ-GONZALEZ,** and others, both known and unknown to the Grand Jury, visited these stash locations to deliver cocaine and to collect, count, and package the money received from **JONES** in exchange for cocaine. These suppliers then transported the money back to Mexico, via the state of Texas. These stash locations also served as temporary residences for **BREMEA**, **SANCHEZ-GONZALEZ, CARRILLO-MONTELONGO**, and others known and unknown to the Grand Jury.

7. The suppliers often used large trucks to transport large shipments of cocaine, often in excess of 200 kilograms, to the Washington, D.C., area, where they unloaded it into smaller vehicles and transported it to the stash locations for storage for as much as a month at a time.

8. **JONES** also rented warehouse facilities for the same purpose. For example, on or about April 30, 2004, a search of **JONES's** warehouse space, located at the Hampton Park Storage Facility, 400 Hampton Park Boulevard, Capitol Heights, Maryland, which he rented from November 17, 2003, until he broke the lease on April 30, 2004, revealed several boxes of heat sealing wrappings and air mattresses, as well as the scent of cocaine, which was detected by a narcotics-sniffing canine.

9. **JONES** periodically collected money from some of his co-conspirators, including **JOHNSON, JACKSON, HUGGINS, HOLLAND, CARTER,** and others known and unknown to the Grand Jury. **JONES** then visited a storage location, and met with **BREMEA** and others, known and unknown to the Grand Jury, to deliver quantities of cash, and pick up multiple-kilogram quantities of cocaine for distribution to these co-conspirators. For example, on September 28, 2005, **JONES** met with **HUGGINS** at his residence in Suitland, Maryland, where he remained for approximately 20 minutes. From there, **JONES** drove directly to the residence of a co-conspirator not indicted herein, but who is known to the Grand Jury, and remained for approximately 20 minutes. After another similar meeting with an individual unknown to the Grand Jury, at 9:35 p.m., **JONES** drove to a stash location, 9508 Potomac Drive, Ft. Washington, Maryland, where he met with **BREMEA** for approximately 45 minutes.

10. From at least some time in 2003, the exact date being unknown to the Grand Jury, through October 24, 2005, **JONES** supplied a number of unindicted co-conspirators, who are known to the grand jury, with kilogram and half-kilogram quantities of cocaine. **JONES** regularly

"fronted," i.e., supplied on consignment, large quantities of cocaine to these co-conspirators, who are known to the Grand Jury. At other times, these co-conspirators paid **JONES** for the cocaine at the time he delivered it to them. These co-conspirators then frequently repackaged the cocaine into smaller quantities, and distributed it either as cocaine hydrochloride or cocaine base. At times, some of the co-conspirators redistributed the cocaine in kilogram form. The total quantity of cocaine **JONES** provided to these co-conspirators during this timeframe was in excess of 150 kilograms.

11. The physical transfer of cocaine and cash took place at Levels, a night club in the District of Columbia owned and operated by **JONES** and managed by **MAYNARD**, at the Prince George's County Sports Complex near FedEx Field in Landover, Maryland, at a Home Depot store, in Landover, Maryland, at Sam's Car Wash on Branch Avenue, in Temple Hills, Maryland, and at other locations known and unknown to the Grand Jury. **MAYNARD** frequently accompanied **JONES** when he met with various co-conspirators to make deliveries of cocaine and to collect large cash payments. On several occasions, **MAYNARD** also made deliveries of cocaine from **JONES** to the co-conspirators. When communicating with some of these co-conspirators over the phone, to avoid detection by law enforcement, **JONES** used "code" to avoid reference to drugs, money, or meeting places for the transfer of drugs or payment for the drugs. The price **JONES** charged per kilogram varied between $20,000, and $23,000, depending on who the co-conspirator was, among other factors. As part of supplying cocaine to these co-conspirators, **JONES** informed one co-conspirator that **JONES** and **MAYNARD** were making periodic trips outside of the Washington, D.C., area to obtain multi-kilogram quantities of cocaine. In reference to the trips, **JONES** spoke of going to "Carolina" and cocaine coming from the "Mexicans" and "Texas."

12. In addition to **MAYNARD**, **JONES** also employed individuals, both known and unknown to the Grand Jury, to assist in the day-to-day operations of his cocaine-trafficking business. One unindicted co-conspirator, known to the Grand Jury, broke down larger amounts of cocaine into smaller packages for **JONES,** or the unindicted co-conspirator, to deliver to other co-conspirators, indicted herein, including **JOHNSON, CARTER, MAYNARD**, and another co-conspirator known to the Grand Jury. The unindicted co-conspirator also collected drug payments for **JONES** from time to time.

13. During the course of wire interceptions on **JONES's** cellular telephone, which ran from September 2, 2005, through October 24, 2005, the code phrases used by these co-conspirators and **JONES** to reference cocaine and money were often overheard, both in conversations between **JONES** and some of the unindicted co-conspirators, and in conversations between **JONES** and the other individuals he supplied, including **JOHNSON, JACKSON, HUGGINS, CARTER, HOLLAND,** and others known and unknown to the Grand Jury.

14. Also during the wire interception, **JONES** spoke with many of his co-conspirators, including **JOHNSON, JACKSON, HUGGINS, CARTER, HOLLAND,** and others known and unknown to the Grand Jury, several times a week to arrange meetings at various locations throughout the Washington, D.C. metropolitan area. On some occasions, **JONES** delivered wholesale quantities of cocaine to the customers, and on other occasions, the customers provided **JONES** money therefor.

15. **JONES** also spoke with **BREMEA** with some frequency during this timeframe, described in paragraph 13, to set up meetings to drop off cash and to collect multiple-kilogram quantities of cocaine, usually at a house located at 9508 Potomac Drive, Ft. Washington, Maryland. During this time, **JONES** also spoke with another male in the Mexican supply-chain, whose identity

is unknown to the Grand Jury, to discuss the timing of large shipments of cocaine from Mexico into the Washington, D.C. area.

16. In or about at least September and October, 2005, **BREMEA, CARRILLO-MONTELONGO, SANCHEZ-GONZALEZ**, and others unknown to the Grand Jury, used the house located at 9508 Potomac Drive, Ft. Washington, Maryland, as a location in which they stored cocaine for distribution, including one time as much as 100 kilograms of powder and crack cocaine. They also used this residence for storage of cash payments, including as much as $800,000, which they received in exchange for the cocaine. They also stored cash packaging equipment in this residence, including plastic shrink-wrapping materials, a heat-sealing machine, a money-counting machine, and a machete. From time to time during this period, they also resided in the house.

17. In or about at least October, 2005, defendants **JACKSON, JOHNSON, HUGGINS,** and a co-conspirator who is known to the Grand Jury, used their residences in the state of Maryland to store cocaine for eventual resale, which they had purchased from **JONES**. **JACKSON, JOHNSON, HUGGINS**, and a co-conspirator who is known to the Grand Jury also stored large sums of money in their residences, the proceeds of cocaine sales to customers, along with firearms and drug packaging materials, including digital scales, and ziplock bags.

18. From at least 2003, the exact date being unknown to the Grand Jury, up to and including October 24, 2005, **JONES** used his vehicle, a 2001 champagne-colored Jeep Grand Cherokee, MD license # M667480, to store cocaine and cash, which he had secreted in a variety of bags, including plastic shopping bags, duffel bags, and backpacks. **JONES** also used his Grand Cherokee to transport cash to his suppliers, **BREMEA** and others, and to transport cocaine from **BREMEA** and others and deliver it to **JACKSON, JOHNSON, HOLLAND, CARTER, HUGGINS,** and other

co-conspirators known and unknown to the grand jury.

### D. OVERT ACTS

In furtherance of the conspiracy, and in order to effectuate the objects thereof, the defendants, and co-conspirators not indicted herein, whose identities are known and unknown to the Grand Jury, in various combinations, directly and indirectly, within the District of Columbia, the state of Maryland, the State of Texas, and elsewhere, committed overt acts including, but not limited to, the following:

**JONES's Distribution Network**

**Specific Distributions**

1. In or about April, 2004, **JONES** distributed 500 grams of cocaine to an unindicted co-conspirator, known to the Grand Jury.

2. In or about the first week of October, 2005, **JONES** distributed one-quarter of a kilogram of cocaine to an unindicted co-conspirator, known to the Grand Jury.

3. On or about October 14, 2005, an unindicted co-conspirator, known to the Grand Jury, delivered $5,000, to **JONES** as advanced payment for one-quarter of a kilogram of cocaine.

4. On or about October 23, 2005, an unindicted co-conspirator, who is known to the Grand Jury, delivered approximately $20,000, to **JONES** as advanced payment for a kilogram of cocaine.

**The Wire**

5. On or about September 27, 2005, at approximately 8:48 p.m., **JONES** and **HUGGINS** had a coded conversation in which **HUGGINS** indicated a drug customer would pay him the next day, frustrating **JONES** who was concerned that his suppliers would be angry because they wanted to be paid.

6. On or about September 27, 2005, at approximately 8:49 p.m., **JONES** and **JOHNSON** had a coded conversation in which **JOHNSON** indicated he was trying to collect some drug payments, frustrating **JONES** who was concerned that his suppliers would be angry because they wanted to be paid.

7. On or about September 27, 2005, at approximately 9:26 p.m., **JONES** and an unindicted co-conspirator, whose identity is known to the Grand Jury, had a coded conversation in which the co-conspirator said it was trying to collect payments, and **JONES** in turn stated he wanted to pay his suppliers.

8. On or about September 27, 2005, at approximately 9:50 p.m., **JONES** visited the stash location at 9508 Potomac Drive, Ft. Washington, Maryland, for approximately 41 minutes.

9. On or about September 28, 2005, in the afternoon, **JONES** and **HOLLAND** had a coded conversation in which they discussed the possibility that **JONES** would have more cocaine available.

10. On or about September 28, 2005, at approximately 5:00 p.m., **JONES** and one of **JONES**'s sources of cocaine, an unindicted co-conspirator, whose identity is unknown to the Grand Jury, spoke in a coded conversation concerning when cocaine would arrive.

11. On or about September 28, 2005, at approximately 5:30 p.m., **JONES** and **HUGGINS** had a coded conversation concerning whether **HUGGINS** had any money to give to **JONES**.

12. On or about September 28, 2005, at approximately 5:30 p.m., **JONES** spoke with an unindicted co-conspirator, who is known to the Grand Jury. In two coded conversations, they discussed the status of cocaine sales and money collection.

13. On or about September 28, 2005, at approximately 5:36 p.m., **JONES** and an unindicted co-conspirator, whose identity is known to the Grand Jury, had a conversation concerning the status

of the co-conspirator's drug sales.

14. On or about September 28, 2005, at approximately 5:37 p.m., **JONES** and **JACKSON** had a coded conversation concerning cocaine supplies and money.

15. On or about September 28, 2005, at approximately 5:40 p.m., **JONES** and **CARTER** had a coded conversation in which they discussed the status of **CARTER**'s drug supply and **JONES** picking up money from **CARTER**.

16. On or about September 28, 2005, at approximately 7:00 p.m., **JONES** and one of **JONES**'s sources of cocaine, an unindicted co-conspirator, whose identity is unknown to the Grand Jury, spoke concerning the arrival of a shipment of drugs.

17. On or about September 28, 2005, at approximately 8:49 p.m., **JONES** and **JOHNSON** had a coded conversation in which **JONES** indicated that drugs had arrived.

18. On or about September 28, 2005, at approximately 9:35 p.m., **JONES** visited the stash location located at 9508 Potomac Drive, Ft. Washington, Maryland, where he remained for approximately 41 minutes.

19. On or about September 29, 2005, at approximately 7:33 a.m., **JONES** and **BREMEA** had a conversation in which **JONES** indicated he would meet **BREMEA** in 15 minutes.

20. On or about September 29, 2005, at approximately 7:34 a.m., **JONES** and one of **JONES**'s sources of cocaine, another unindicted co-conspirator, related to **BREMEA**, whose identity is not fully known to the Grand Jury, had a conversation in which **JONES** indicated he would meet the source in 15 minutes.

21. On or about September 29, 2005, at approximately 8:26 a.m., **JONES** visited the stash location, 9508 Potomac Drive, Ft. Washington, Maryland, where he remained for approximately 42

minutes.

22. On or about September 30, 2005, at approximately 9:25 a.m., **JONES** and **BREMEA** had a conversation in which **JONES** indicated he would meet **BREMEA** in 10 minutes.

23. On or about September 30, 2005, at approximately 9:26 a.m., **JONES** and one of **JONES**'s sources of cocaine, another unindicted co-conspirator, related to **BREMEA**, whose identity is not fully known to the Grand Jury, had a conversation in which **JONES** indicated he would meet the source in 10 minutes.

24. On or about September 30, 2005, at approximately 9:49 a.m., **JONES** visited the stash location, 9508 Potomac Drive, Ft. Washington, Maryland, where he remained for approximately one hour.

25. On or about October 1, 2005, at approximately 7:04 p.m., **JONES** and **BREMEA** had a conversation in which **JONES** indicated he would meet **BREMEA** in 15 to 20 minutes.

26. On or about October 1, 2005, at approximately 7:08 p.m., **JONES** and one of **JONES**'s sources of cocaine, another unindicted co-conspirator, related to **BREMEA**, whose identity is not fully known to the Grand Jury, had a conversation in which **JONES** indicated he would meet the source in 10 minutes.

27. On or about October 1, 2005, at approximately 7:56 p.m., **JONES** visited the stash location at 9508 Potomac Drive, Ft. Washington, Maryland, where he remained for approximately one hour.

28. On or about October 3, 2005, at approximately 7:16 p.m., **JONES** and **BREMEA** spoke about meeting.

29. On or about October 4, 2005, at approximately 10:56 a.m., **JONES** and **BREMEA** spoke about meeting in the next 15-20 minutes.

30. On or about October 4, 2005, at approximately 11:20 a.m., **JONES** told **BREMEA** that **JONES** would be at the stash location in 10 minutes.

31. On or about October 4, 2005, at approximately 11:33 a.m., **JONES** and **BREMEA** met at the stash location, 9508 Potomac Drive, Ft. Washington, Maryland, for approximately 12 minutes.

32. On or about October 4, 2005, at approximately 4:25 p.m., **JONES** and **BREMEA** spoke in a coded conversation about the arrival of a quantity of cocaine.

33. On or about October 7, 2005, at approximately 3:23 p..m., **JONES** and **BREMEA** spoke in a coded conversation about the anticipated arrival of a quantity of cocaine the next day.

34. On or about October 8, 2005, at approximately 11:26 a.m., **JONES** and **BREMEA** spoke in a coded conversation, in which **BREMEA** told **JONES** that the drug shipment had been delayed and would probably not be arrive until Monday (October 10). They agreed to meet in 15 -20 minutes.

35. On October 8, 2005, at approximately 11:59 a.m., **JONES** met with **BREMEA** at the stash location, 9508 Potomac Drive, Ft. Washington, Maryland, for approximately 38 minutes.

36. On or about October 8, 2005, at approximately 7:38 p.m., **JONES** told **HUGGINS** in a coded conversation that the cocaine shipment had been delayed.

37. On or about October 9, 2005, at approximately 11:14 a.m., **JONES** and **BREMEA** spoke in a coded conversation in which **BREMEA** told **JONES** that he would call **JONES** as soon as the cocaine arrived.

38. On or about October 10, 2005, at approximately 7:08 p.m., **JONES** and one of **JONES**'s sources of cocaine, an unindicted co-conspirator, whose identity is unknown to the Grand Jury, had a conversation in which the source indicated something would be happening in seven or eight days.

39. On or about October 10, 2005, at approximately 9:30 p.m., **JONES** had a conversation with **BREMEA**, who told **JONES** that someone would be arriving in about four hours.

40. On or about October 11, 2005, at approximately 7:40 a.m., **JONES** and **BREMEA** spoke in a coded conversation, in which **BREMEA** told **JONES** that he had cocaine, and they agreed to meet in approximately 25 minutes.

41. On or about October 11, 2005, at approximately 8:00 a.m., **JONES** and **HOLLAND** discussed meeting.

42. On or about October 11, 2005, at approximately 8:00 a.m., **JONES** and **JOHNSON** discussed meeting.

43. On or about October 11, 2005, at approximately 8:40 a.m., **JONES** and **JACKSON** discussed meeting.

44. On or about October 11, 2005, at approximately 8:40 a.m., **JONES** and **BREMEA** spoke and agreed to meet in approximately 10 minutes.

45. On or about October 11, 2005, at approximately 9:09 a.m., **JONES** met with **BREMEA** at the stash location, 9508 Potomac Drive, Ft. Washington, Maryland, for approximately one hour and 45 minutes.

46. On or about October 12, 2005, at approximately 12:36 p.m., **JONES** and **BREMEA** spoke in a coded conversation in which **BREMEA** indicated that a shipment of cocaine would be arriving the next day in the evening.

47. On or about October 12, 2005, at approximately 12:45 p.m., in a coded conversation, **JONES** spoke with an unindicted co-conspirator, who is known to the Grand Jury and told it that a cocaine shipment was expected the next day.

48. On or about October 12, 2005, at approximately 1:41 p.m., **JONES** and **HUGGINS** had a coded conversation in which **JONES** told **HUGGINS** that the shipment of cocaine was arriving "tomorrow."

49. On or about October 12, 2005, at approximately 3:06 p.m., **JONES** and **JACKSON** had a coded conversation in which **JONES** told **JACKSON** that the shipment was arriving tomorrow.

50. On or about October 13, 2005, at approximately 12:45 p.m., **JONES** and **BREMEA** had a conversation in which **JONES** stated that he had to make some "runs" but that they could meet in 30 minutes.

51. On or about October 13, 2005, at approximately 5:25 p.m., **JONES** and **BREMEA** spoke in a coded conversation in which **BREMEA** indicated that a shipment of cocaine would be arriving at approximately 8:00 o'clock that evening.

52. On or about October 13, 2005, at approximately 7:13 p.m., **JONES** and **BREMEA** had a conversation in which **JONES** stated that he was five to 10 minutes away.

53. On or about October 13, 2005, at approximately 7:19 p.m., **JONES** met with **BREMEA** at the stash location, 9508 Potomac Drive, Ft. Washington, Maryland, until approximately 7:47 p.m.

54. On or about October 13, 2005, at approximately 7:47 p.m., **JONES** called **HOLLAND**.

55. On or about October 13, 2005, at approximately 7:49 p.m., **JONES** called **JOHNSON.**

56. On or about October 13, 2005, at approximately 7:51 p.m., **JONES** called **HUGGINS**.

57. On or about October 13, 2005, at approximately 7:53 p.m., **JONES** called an unindicted

15

conspirator, whose identity is known to the Grand Jury.

58. On or about October 14, 2005, at approximately 7:01 a.m., **JONES** visited the stash location at 9508 Potomac Drive, Ft. Washington, Maryland, for approximately one hour.

59. On or about Wednesday, October 19, 2005, at approximately 11:15 a.m., one of **JONES**'s sources of cocaine, an unindicted co-conspirator, whose identity is unknown to the Grand Jury, left a coded message for **JONES** that a shipment of cocaine would be arriving on Thursday or Friday.

60. On or about Wednesday, October 19, 2005, at approximately 11:16 a.m., **JONES** and one of **JONES**'s sources of cocaine, an unindicted co-conspirator, whose identity is unknown to the Grand Jury, spoke and the source reiterated that a shipment of cocaine would be arriving on Thursday or Friday.

61. On or about October 19, 2005, at approximately 5:19 p.m., **JONES** and **BREMEA** had a conversation in which **BREMEA** stated that he was home, and **JONES** stated that he would call him later.

62. On or about Thursday, October 20, 2005, at approximately 6:25 p.m., **JONES** visited the stash location, 9508 Potomac Drive, Ft. Washington, Maryland, for approximately one hour and 20 minutes.

63. On or about October 23, 2005, at approximately 8:00 p.m., **JONES** spoke with an unindicted co-conspirator, who is known to the Grand Jury, and stated in a coded reference that he had to make contact with his customers because cocaine was available.

64. On or about October 23, 2005, at approximately 8:10 p.m., **JONES** and **HUGGINS** spoke in a coded conversation in which **JONES** indicated that cocaine was available and they agreed

to meet.

65. On or about October 23, 2005, in the evening, **JONES** and **HUGGINS** met to further a cocaine transaction.

66. On or about October 23, 2005, at approximately 9:12 p.m., **JONES** left **CARTER** a message to call him because something was "here."

67. On or about October 23, 2005, in the evening, **JONES** and **CARTER** met to further a cocaine transaction.

68. On or about October 23, 2005, in the evening, **JONES** met with an unindicted conspirator, whose identity is known to the grand jury, who gave **JONES** approximately $20,000, as advanced payment for a kilogram of cocaine.

### Search Warrants

69. On October 24, 2005, at his home in Waldorf, Maryland, **JONES** was in possession of in excess of $69,000, in cash, which he had recently collected from his customers, and which he was planning to deliver to **BREMEA** as payment for a quantity of cocaine.

70. On October 24, 2005, at his home in Landover, Maryland, **JACKSON** was in possession of proceeds from drug sales totaling $2,743, approximately 40 grams of crack cocaine, derived from cocaine which he had obtained from **JONES**, and a loaded handgun.

71. On October 24, 2005, an unindicted co-conspirator, known to the Grand Jury, was in possession of approximately 150 grams of cocaine, which he had obtained from **JONES**, along with two handguns and $9,600, in cash, which was proceeds from earlier drug sales.

72. On October 24, 2005, **HUGGINS's** home in Suitland, Maryland, contained approximately 125 grams of cocaine, which he had obtained from **JONES**, along with $10,750, in

cash, which was proceeds from earlier drug sales, and a digital scale and other drug packaging materials.

73. On October 24, 2005, at his home in Waldorf, Maryland, **JOHNSON** was in possession of approximately one-half kilogram of cocaine, which he had previously obtained from **JONES**, along with $12,545, in cash, which was proceeds from earlier drug sales, and a digital scale and other drug packaging materials.

74. On October 24, 2005, a search warrant of 9508 Potomac Drive, Ft. Washington, Maryland, revealed 97 kilograms of cocaine, individually packaged and secreted in several duffel bags, 3 kilograms of crack cocaine, in excess of $800,000, at least $700,000, of which was packaged in heat-sealed bundles and secreted in duffel bags, heat sealing equipment and wrappers, ledger books and pay sheets, several air mattresses, several religious candles, and a machete, along with **CARRILLO-MONTELONGO, SANCHEZ-GONZALEZ** and **BREMEA,** who was attempting to exit through an elevated bathroom window in the rear of the house.

75. On October 25, 2005, **CARTER's** home in Southeast, Washington, D.C. contained drug packaging equipment, including two digital scales, a strainer, and numerous empty ziplock baggies, along with assorted ammunition and shotgun shells.

> (**Conspiracy to Distribute and Possess With Intent to Distribute 5 Kilograms or More of Cocaine and 50 Grams or More of Cocaine Base**, in violation of Title 21, United States Code, Section 846)

### COUNT TWO

In or about April, 2004, in the District of Columbia, **ANTOINE JONES** and a co-conspirator not indicted herein, who is known to the Grand Jury, possessed with intent to distribute a mixture or substance containing a detectable amount of cocaine, a schedule II narcotic drug

controlled substance, and the amount of said mixture or substance was 500 grams or more.

>   (**Unlawful Possession with Intent to Distribute 500 Grams or More of Cocaine and Aiding and Abetting**, in violation of Title 21, United States Codes, Sections 841(a)(1) and 841(b)(1)(B)(ii) and Title 18, United States Code, Section 2)

### COUNT THREE

In or about the first week of October, 2005, in the District of Columbia, **ANTOINE JONES** and a co-conspirator not indicted herein, possessed with the intent to distribute a mixture or substance containing a detectable amount of cocaine, a schedule II narcotic drug controlled substance, and the amount of said mixture or substance was 250 grams or more.

>   (**Unlawful Possession with Intent to Distribute Cocaine and Aiding and Abetting**, in violation of Title 21, United States Codes, Sections 841(a)(1) and 841(b)(1)(C) and Title 18, United States Code, Section 2)

### COUNT FOUR

On or about October 24, 2005, **ADRIAN JACKSON,** did unlawfully and knowingly use, carry, and brandish, during and in relation to, and possess in furtherance of, a drug trafficking offense, for which he may be prosecuted in a court of the United States, that is Count One of this Indictment which is incorporated herein, a firearm, that is, a Steyr M-40 semi-automatic pistol.

>   (**Using, Carrying, Brandishing, and Possessing a Firearm During a Drug Trafficking Offense**, in violation of Title 18, United States Codes, Section 924(c)(1)(A)(ii))

A TRUE BILL:

FOREPERSON

Attorney of the United States in
and for the District of Columbia