# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 05-CR-386(1)(ESH)** |
| | **:** | |
| **ANTOINE JONES** | | |

## GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANT'S LEGAL MOTIONS

**KENNETH L. WAINSTEIN**
**United States Attorney**

**RACHEL CARLSON LIEBER**
**JOHN V. GEISE**
**Assistant United States Attorneys**

# TABLE OF CONTENTS

I.    FACTUAL OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.   THE WIRE AND ELECTRONIC COMMUNICATIONS . . . . . . . . . . . . . . . . . . . . 6

      A.    Franks v. Delaware challenges to the text messaging searches and the
           Title III intercept . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.    The Text-Messaging Search Warrants . . . . . . . . . . . . . . . . . . . . . . . . 7
           1.    The Governing Law Concerning Suppression . . . . . . . . . . . . 7
                  a.    Stored electronic messages are not governed by
                        Title III. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
                  b.    The Stored Communications Act provides no
                        suppression remedy.
                        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
                  c.    There is no Fourth Amendment interest in
                        messages held by a third party, particularly if
                        they are not messages in the defendant's account 10
           2.    The August 10th Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
                  a.    The evidence contained in the August 10th
                        Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
                  b.    The evidence contained in the August 18th
                        Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
                  c.    The affidavits do not contain false statements. 15
                  d.    S.A. Yanta did not make any false statement
                      knowingly or with a reckless disregard for the
                      truth. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
                  e.    Even without the contested portions, the
                      affidavit satisfied probable cause . . . . . . . . . . 21

      C.    The Title III Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
           1.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
           2.    The First Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
                  a.    Goals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
                  b.    Probable cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
                  c.    Alternate Techniques . . . . . . . . . . . . . . . . . . . . . . 26
           3.    The Defendant's Attack On Probable Cause . . . . . . . . . . . . 28
           4.    The Exhaustion and Necessity Requirement . . . . . . . . . . . . 28
                  a.    The legal requirement . . . . . . . . . . . . . . . . . . . . . 29
                  b.    The requirement was more than met by Special
                      Agent Yanta's Affidavit . . . . . . . . . . . . . . . . . . . 31
                        (1)    Surveillance . . . . . . . . . . . . . . . . 32

     (2) <u>Pen registers</u> . . . . . . . . . . . . . . . . 33
     (3) <u>Confidential informants</u> . . . . . . 33
     (4) <u>Grand jury and search warrants</u> . . 34
    c. <u>The Wiretap Extension</u> . . . . . . . . . . . . . . . . . . . . . . . 34
    d. <u>Minimization</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

III. <u>MOTION TO ADOPT AND CONFORM TO CO-DEFENDANT'S MOTIONS</u> . . 36

IV. <u>MOTION FOR A PRELIMINARY DETERMINATION OF CONSPIRACY AND
PRETRIAL RULING ON THE ADMISSIBILITY OF CO-CONSPIRATOR'S
STATEMENTS</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

V. <u>MOTION FOR DISCOVERY OF CO-DEFENDANT AND CONSPIRATOR
STATEMENTS</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

VI. <u>MOTION TO DISCLOSE IDENTITIES OF EACH CONFIDENTIAL
INFORMANT REGARDLESS OF WHETHER THEY WILL BE CALLED AT
TRIAL</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

VII. <u>MOTION FOR AN ORDER DIRECTING THE GOVERNMENT TO SPECIFY
ALL EVIDENCE WHICH MAY BE SUBJECT TO SUPPRESSION</u> . . . . . . . . . 42

VIII. <u>MOTION TO SUPPRESS TANGIBLE EVIDENCE OBTAINED FROM JEEP
CHEROKEE AND LEVELS NIGHTCLUB</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
  A. <u>Factual Background</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

  B. <u>The Affidavits Were Sufficient On Their Face</u> . . . . . . . . . . . . . . . . . 44

  C. <u>The Agents Executing The Warrants Relied On Them In Good Faith</u>
   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

  D. <u>The Warrants Were Properly Executed</u> . . . . . . . . . . . . . . . . . . . . . 46
    1. <u>Factual Background</u> . . . . .. . . . . . . . . . .. . . . . . . . . . . . . .47
    2. <u>The agents had independent probable cause to search the
  jeep</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48
    3. <u>The defendant's consent was voluntary</u>. . . . . . . . . . . . . . . 49
    4. <u>The agents did not violate Federal Rule of Criminal
  Procedure 41(f)</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

IX. <u>MOTION TO SUPPRESS EVIDENCE OBTAINED FROM GLOBAL TRACKING
DEVICE</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

X.    **MOTION TO SUPPRESS TANGIBLE EVIDENCE FROM THE GREEN HONDA ODYSSEY MINI-VAN** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **56**

      A.    **Jones lacks standing to challenge the search of the minivan** . . . . . . . **57**

      B.    **Maynard had authority to consent and indeed did consent.** . . . . . . **58**

      C.    **The narcotics-sniffing canine alert provided independent probable cause to search the minivan.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **60**

XI.    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **64**

**GOVERNMENT'S OMNIBUS RESPONSE**
**TO DEFENDANT'S SEVERAL MOTIONS**

Pursuant to the arguments set forth in the following omnibus response, and any other arguments which may be made at a hearing on this matter, the United States of America, by its attorney, the United States Attorney for the District of Columbia, respectfully opposes the following several pretrial motions filed by defendant Antoine Jones in this matter: (1) a motion to suppress evidence obtained from interception of wire communications and seizure of electronic communications; (2) a motion to adopt and conform to codefendant's motions; (3) a motion for a preliminary determination of the conspiracy and a pretrial ruling on the admissibility of co-conspirator's statements; (4) a motion for discovery of codefendant and co-conspirator statements; (5) a motion to disclose the identities of each confidential informant regardless of whether they will be called at trial; (6) a motion for an order directing the government to specify all evidence which may be subject to suppression; (7) a motion to suppress tangible evidence obtained from his Jeep Cherokee; (8) a motion to suppress evidence obtained from mobile tracking device; (9) a motion to suppress tangible evidence seized from a green Honda Odyssey minivan; and (10) a motion to suppress evidence seized at the Levels nightclub.[1]

## I. FACTUAL OVERVIEW

All the defendants are charged with Conspiracy to Distribute and Possess with Intent to Distribute 5 Kilograms or more of Cocaine and 50 Grams or More of Cocaine Base, and various individual counts of Use of a Communication Facility to Facilitate a Drug Trafficking Offense.

---

[1]    On July 21, 2006, defendant Kevin Holland filed a motion to adopt motions filed by his codefendants.  Because he filed no motion of substance, we confine our responses to the substantive motions filed by Jones.

In addition, Jones is charged in several counts with Unlawful Possession with Intent to Distribute Cocaine or Cocaine Base.  Jackson is charged with Using, Carrying, Brandishing, and Possessing a Firearm During a Drug Trafficking Offense.

The Indictment spans a period beginning sometime in 2003 through October, 2004, in the Washington, DC, Metropolitan Area, the State of Maryland, the State of Texas, the State of North Carolina and elsewhere.  The Indictment alleges that Defendants Jones, Jackson, Huggins, Holland, Carter, and their co-conspirators, acquired, repackaged, stored, processed, sold, and redistributed quantities of cocaine and cocaine base in the District of Columbia, the State of Maryland, the State of Texas, the Republic of Mexico, and elsewhere.  Jones was the primary supplier of cocaine and cocaine base to members of the organization in the District of Columbia and the State of Maryland.

As part of the investigation of the case agents utilized a number of techniques, including search warrants to obtain text messages on cellular telephones used by Antoine Jones and Lawrence Maynard, surveillance, informants, and a Title III wire intercept.  The covert portion of the investigation in the case ended on October 24, 2005, with searches pursuant to warrants and arrests.  At that time, drugs, drug paraphernalia, firearms, and significant quantities of cash were seized from the homes of a number of the defendants, as well as from a stash house where substantial quantities of drugs and cash were found.  The evidence at trial will include, *inter alia,* items seized on October 24, 2005, a number of conversations intercepted pursuant to Title III orders, and the testimony of individuals who were part of Jones's drug organization.  Further facts relevant to particular issues are detailed in the discussion of those issues.

## II.  THE WIRE AND ELECTRONIC COMMUNICATIONS

_____   Jones moves this Court to suppress evidence obtained from the interception of wire communications (telephone conversations) on his cellular telephone and electronic communications (text-messages) on his cellular telephone, and that of Lawrence Maynard, claiming variously that the agents violated both the probable cause and exhaustion requirements of the Wire Tap Act, 18 U.S.C. § 2518(1)(c), and that F.B.I. Special Agent Stephanie Yanta intentionally misled the authorizing court and demonstrated a reckless disregard for the truth in setting forth factual allegations in her affidavit in support of the wiretap application.  As set forth below, these claims are utterly without merit and should be denied.

### A.  Franks v. Delaware challenges to the text messaging searches and the Title III intercept

A number of the motions filed by Jones involve claims of deliberate material misstatements under Franks v. Delaware, 438 U.S. 154 (1977).[2]  An accurate overview of the meaning of Franks is therefore appropriate at the beginning of this response.

As a general matter, there is a "presumption of validity" in support of search warrant affidavits.  The rule granting entitlement to an evidentiary hearing to challenge affidavits, as set forth in Franks, is "limited [in] scope, both in regard to when exclusion of the seized evidence is mandated, and when a hearing on allegations of misstatements must be accorded."  Id. at 167.  As the Court of Appeals has emphasized, a warrant that was made pursuant to an affidavit and issued by a detached and neutral magistrate enjoys a presumption of good faith such that the

---

[2]    E.g., the present motion, and Jones's motions to suppress the evidence seized from his Jeep, his motion to suppress the GPS device, and his motion to suppress the evidence seized from Levels nightclub.

6

burden of rebuttal falls upon the defense.  United States v. Richardson, 861 F.2d 291, 293-94

(D.C. Cir. 1988) (citations omitted), *cert. denied,* 489 U.S. 1058 (1989); Franks, 438 U.S. at 163.

To meet this burden, the defense must make "a substantial preliminary showing that a false

statement was knowingly and intentionally, or with reckless disregard for the truth, included by

the affiant in the warrant or affidavit," and that "the allegedly false statement is necessary to the

finding of probable cause." Franks, 438 U.S. at 154; Richardson, 861 F.2d at 293-94.

While the precise question in Franks was whether the defendant was entitled to an

evidentiary hearing on the issue of falsity, subsequent judicial decisions have applied the second

prong of the Franks test to make it clear that even if deliberate misstatements are found, a hearing

is not appropriate unless the misstatement is critical to the finding of probable cause.  See

Richardson, 861 F.2d at 294; Jones v. United States, 336 A.2d 535,537 (D.C. 1975), *cert. denied*,

423 U.S. 997 (1975).

### B.  The Text-Messaging Search Warrants

On August 10, 2005, and again on August 18, 2005, search warrants were issued to

several phone companies by a Magistrate Judge of this Court for stored text messages that had

been transmitted over phones used by Antoine Jones and Lawrence Maynard.  A number of these

messages were supplied by the companies in response to the search warrants.  Some of the

messages were mentioned in the affidavit in support of the first wire intercept.

### 1.  The Governing Law Concerning Suppression

Before addressing some of the factual allegations made in Jones's motions, it is useful to

have an accurate overview of the controlling authority on claims for suppression of stored text

messages.

a.  <u>Stored electronic messages are not governed by Title III.</u>

Jones's motion to suppress electronic evidence spends considerable time discussing the unique Title III requirement of exhaustion, 18 U.S.C. 2518(c), in challenging the affidavit and search warrant for these stored messages.  Jones Wire/Electronic Communications Mot. at 8-15.  However Title III only applies to real time interception of electronic communications.  Here the messages were *stored* in the hands of a third party who provided them to the government.

As Professor Fishman points out, "[a]n interception occurs, however, only if the contents are acquired as the communication takes place, not if they are acquired while the communications are in storage. . . .  As a result, 'very few seizures of electronic communications from computers will constitute interceptions'. . . .  Rather, the primary statutory protection for electronic communications lies in 18 USC § 2701 et seq., regulating the access to stored electronic communications." Fishman, <u>Wiretapping and Eavesdropping</u>, § 2:5 (West, 2d.ed. 1995) (citations omitted).  *Accord*, <u>Konop v. Hawaiian Airlines</u>, 302 F.3d 868, 879 (9th Cir. 2002) ("[t]he level of protection provided stored communications under the SCA [Stored Communication Act, 18 U.S.C. § 2701 et.seq.] is considerably less than that provided communications covered by the Wiretap Act.  Section 2703(a) of the SCA details the procedures law enforcement must follow to access the contents of stored electronic communications, but these procedures are considerably less burdensome and less restrictive than those required to obtain a wiretap order under the Wiretap Act. . . .  Thus, if [the plaintiff's] position were correct and acquisition of a stored electronic communication were an interception under the Wiretap Act, the government would have to comply with the more burdensome, more restrictive procedures of the Wiretap Act to do exactly what Congress apparently authorized it to do under the less

8

burdensome procedures of the SCA. Congress could not have intended that result"); United

States v. Steve Jackson Games, 36 F.3d 457, 463 (5ᵗʰ Cir. 1994) ("[I]n light of the substantial

differences between the statutory procedures and requirements for obtaining authorization to

intercept electronic communications, on the one hand, and to gain access to the contents of stored

electronic communications, on the other, it is most unlikely that Congress intended to require law

enforcement officers to satisfy the more stringent requirements for an intercept in order to gain

access to the contents of stored electronic communications.")[3]

      b.  The Stored Communications Act provides no suppression remedy.

The relevant statutory provision governing searches of stored electronic communications

is the Stored Communications Act, 18 U.S.C. § 2701 et. seq.  Section 2703(a) of the Act

provides that "[a] governmental entity may require the disclosure by a provider of electronic

communication service of the contents of a wire or electronic communication, that is in

---

[3] Even if this were a situation where the requirements of Title III applied, which it clearly
is not, the failure to exhaust alternate techniques would not be a grounds for suppression.  The
suppression remedy of Title III, which is certainly more robust than constitutional suppression
under the 4ᵗʰ Amendment, derives from 18 U.S.C. 2515, which states in relevant part that
"[w]henever any wire or oral communication has been intercepted, no part of the contents of such
communication and no evidence derived therefrom may be received in evidence in any trial . . .if
the disclosure of that information would be in violation of this chapter."  Notably absent from
this provision is any reference to statutory suppression for electronic communications including
the kind of text messages at issue here.  This is not an accidental oversight – the statutory
suppression remedies simply do not apply to electronic communications.  United States v.
Steiger, 318 F.3d 1039, 1046 (11ᵗʰ Cir. 2003) ("We also hold that while the Wiretap Act clearly
provides criminal and civil sanctions for the unlawful interception of electronic communications,
see 18 U.S.C. §§ 2511(1), (4), (5), 2520, the Act provides no basis for moving to suppress such
communications"); United States v. Meriwether, 917 F.2d 955, 960 (6ᵗʰ Cir. 1990) ("The ECPA
does not provide an independent statutory remedy of suppression for interceptions of electronic
communications"); United States v. Jones, 364 F.Supp. 2d 1303, 1308-9 (D.Utah 2005) ("In
sum, [the defendant] may not suppress evidence obtained from the interception of his personal
email account because the Wiretap Act's suppression remedy, § 2515, does not apply to the
interception of electronic communications").

electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court with jurisdiction over the offense under investigation. . . ." However, while providing that a search warrant is the proper method to obtain communications of this type, the Act does not create any statutory suppression remedy. Fishman, *supra*, at §26:17 ("[V]iolations of the [Stored Communications Act] may render the offender susceptible to criminal prosecution or civil action, but do not create grounds to suppress evidence in a criminal prosecution unless those violations also violate a criminal defendant's constitutional rights in a way that triggers a constitutional exclusionary rule"); United States v. Charles, 1998 WL 20496, *21 (D.Mass. 1998) ("ECPA provides only a civil remedy for a violation of § 2703"); United States v. Allen, 53 M.J. 402, 409 (CAAF 2000) ("Although neither a warrant nor a court order was obtained, there is no exclusionary rule relief under § 2703").

     c.   There is no Fourth Amendment interest in messages held by a third party, particularly if they are not messages in the defendant's account.

The information obtained from the accounts of Jones and Maynard were stored in the hands of cell phone companies. It is doubtful that Jones has any protected Fourth Amendment interest in records in the hands of a third party. Smith v. Maryland, 442 U.S. 735, 743 (1979) ("This Court consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."); Commonwealth v. Cote, 556 N.E. 2d 45, 49-50 (Mass. 1990) (phone messages kept by a third party answering service have no reasonable expectation of privacy under the 4th amendment). And Jones certainly had no reasonable expectation of privacy in Maynard's records simply because he may have sent some text

messages to Maynard's phone. <u>Meriwether</u>, *supra*, 917 F.2d at 959 (no Fourth Amendment protection in message sent to another person's pager "[s]ince the actual confidentiality of a message to a pager is quite uncertain, we decline to protect appellant's misplaced trust that the message actually would reach the intended recipient").

> 2. The August 10th Affidavit

Even if, in the abstract, there may be some form of suppression remedy for seizures of stored communications in the hands of third parties, this is not that case. The Affidavits In Support of Search Warrants For Computer Networks Maintained By Electronic Communications Service Providers Sprint Spectrum LTD, and Cingular Wireless, sworn on August 10, 2005, (hereinafter referred to as the August 10th Affidavit), and on August 18, 2005, (hereinafter referred to as the August 18th Affidavit), contain more than enough evidence to meet the standard for probable cause. The August 10th Affidavit cites three separate confidential sources and the August 18th Affidavit provides specific references to coded text messages, supporting investigators' belief that Jones was engaged in illicit activity. It is important to note that in addition to the corroborating testimony of each of the confidential informants and specific messages, agents investigated Jones's alleged activity through surveillance, searches, debriefings, review of electronic data, and other investigative techniques. The combined evidence obtained from these sources provided more than enough probable cause to believe that Jones operated a conspiracy to distribute narcotics, and that Jones and Maynard were using text messages on their phones to further that conspiracy. A review of this evidence follows.

a.   The evidence contained in the August 10th Affidavit

The government's initial information regarding Jones's activities came from confidential sources.  CS-1 attested that it had met Antoine Jones sometime in the summer of 2003, through a mutually trusted dealer, and shortly thereafter began purchasing multiple quantities of cocaine directly from Jones.  August 10th Affidavit at 9.  CS-1 stated that Jones used Jones's club, Levels, as a front for trafficking narcotics, and CS-1 provided detailed pricing, packaging, distribution, and operating information that included Jones's use of disposable phones to arrange drug transactions, and backpacks to make transfers of cocaine and money.  Id. at 10-14.  CS-1 further revealed that Jones's possible pick up location was in "Carolina," (id. at 10), and that Jones's supplier was in Mexico or Texas.  Id. at 11.  CS-1 detailed vehicles, individuals, and locations Jones used to transport and distribute the narcotics. Id. at 12-14.

Jones's involvement in suspected illicit activity was further supported by CS-2, who purchased multiple-kilogram quantities of cocaine from Jones throughout 2003 and 2004. Id. at 14.  CS-2 continued to deal with Jones until CS-2 was arrested in 2004, for possessing a large wholesale quantity of cocaine that CS-2 had recently purchased from Jones. Id.  CS-2 stated that it had heard in 2004, that Jones had purchased a warehouse, near the Fifth Police District, from which he conducted his narcotics operations.  Id. at 15.  CS-2 independently confirmed details provided to investigators by CS-1 concerning pricing, packaging, vehicles used to transport the drugs, and procedures used to distribute the drugs.  For example, CS-1 and CS-2 both describe a white mini-van and a champagne colored Jeep as the vehicles Jones used to meet them when conducting sales, (id. at 13, 16), and both informants detail purchasing similarly trademarked kilogram packages of cocaine transported in shopping bags or backpacks for approximately the

same prices. Id. at 10, 13-16.

If this weren't enough to substantiate probable cause, a third informant, CS-3, detailed that Anthony Koonce, a suspected cocaine customer of Jones, had bought five to ten kilograms of cocaine at a time for $18,000, to $19,000, per kilogram, from a person who owned the club Levels. Id. at 17. None of the three informants had any business or personal relationships with each other; indeed, they didn't even know of each other. Id. at 14, 17. In addition, the details of each story were corroborated by independent investigation.

FBI agents conducted criminal history background checks on Jones and a number of his associates, revealing for many of them arrests and convictions for narcotics and narcotics-related offenses. Id. at 5, 6,18 , 24-25. Surveillance and background research revealed that the van and Jeep described by CS-1 and CS-2 were registered to Jones and his wife. Id. at 22. Both vehicles were observed at Jones's club, Levels, during the month of March, 2005. Id. 22-23. A traffic stop corroborated CS-1's information that Jones used his club as a front for drug trafficking, that the vehicles had been used to transport drugs, and that Jones's pick up location might be in "Carolina." Jones's club manager, Maynard, was stopped in North Carolina for a speeding violation. Id. at 11, 18-20. After an interdiction canine alerted on the right rear passenger area of the minivan, which Maynard was driving and which was registered to Jones, officers searched the van and recovered from a hidden compartment was $67,115.00, in U.S. currency, bundled together and contained in plastic shopping bags. Id. at 19.

A review of pen-register data on the day of the stop revealed an unusual pattern of 25 text-messages between Maynard's telephone and a series of unknown numbers within a 3-hour period in the early morning. Id. at 20. Not another text message was sent until 11:52, that

evening.  Id.  Further review of pen-register data revealed 17,908, activations on Maynard's

telephone within a 6-month period, including numerous calls between Jones and other

individuals with known narcotics records.  Id. at 23-25.  Further, the pen data confirmed

information from CS-1 that Jones's supplier might be located in Texas. Several calls made to a

Texas telephone number and a number in Jamaica that occurred at the end of the month, for

several months, suggested these numbers were Jones's suppliers, when combined with the

information from CS-1 that Jones received his cocaine shipment at the beginning of each month.

Id. at 16, 26.

      In addition, several weeks prior to the government's August 10, 2005, request for an

order to retrieve stored electronic text messages, an analysis of pen register data revealed that the

target telephones used by Jones and Maynard showed an increase in text messaging from 50% of

all activations to 90%.  Id. at 26-27.  Investigators believed that Jones and Maynard were

unaware of law enforcement officers' technological capabilities to obtain text message data and

were using this form of communication in an attempt to conceal their narcotics trafficking

activity. Id. at 27.

      Finally, on July 26, 2005, Jones's phone received two calls originating from a number in

Uzbekistan.  Id.  The first call lasted a duration of zero seconds and the second a total of 9

seconds.  Id.  While this in and of itself is insignificant, approximately five seconds later,

Maynard's phone received a phone call from the same number in Uzbekistan, lasting a total of

seven minutes and 29 seconds.  Id.  The phone call to Maynard's phone, a mere five seconds after

being unable to reach Jones's phone, precludes the explanation that the call from Uzbekistan was

a wrong number.  In addition, investigators believed that the call from Uzbekistan related to

Jones's narcotics operation because the call originated in the same time frame as the contacts

between the target telephones and the number in Texas and the shift to the increasing use of text

messages.  Id. at 27-28.  As S.A. Yanta noted, Uzbekistan is a major exporter of poppy, from

which opium and heroin are derived.  Id. at 28.

b.  The evidence contained in the August 18th Affidavit

The August 18th Affidavit contained all of the foregoing information.  In addition,

pursuant to a warrant signed on August 10, 2005, by Magistrate Judge Alan Kay of this Court,

Sprint Spectrum, LP provided investigators with approximately 180 text messages sent to and

from Maynard's cellular telephone.  August 18th Affidavit at 28.  Investigators believed that these

texts contained several suspicious messages.  Id.  While the contents of these messages seem

innocent enough, stating such things as "I need ice 4 my beer," "2 cokes & Malibu, pls. Ka$h

Money," and several references to "working with a monster," as S.A. Yanta noted, "it is common

for narcotics traffickers to use seemingly innocuous terms to refer to narcotics and narcotics

transactions."  Id.  Investigators believed that in light of the context provided by the confidential

informants and the increased activity observed by surveillance at Jones's nightclub, Levels, these

messages referred to demand for Jones's product and a recently received shipment of narcotics.

Id. at 29.

c.  The affidavits do not contain false statements.

The defendant has not shown that the affidavits contain material false statements.  The

Court of Appeals has interpreted the requirement of a false statement to include both the

categories of misstatement and omission.  United States v. Johnson, 696 F.2d 115, 118 (D.C. Cir.

1982).  However, while recognizing omissions as part of the Franks test, they are not subject to

15

the same high level of scrutiny as misstatements because "the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory. The latter situation potentially opens officers to endless conjecture about investigative leads, fragments or information, or other matters that might, if included, have redounded to defendant's benefit. The potential for endless rounds of <u>Franks</u> hearings to contest facially sufficient warrants is readily apparent. " <u>United States v. Colkley</u>, 899 F.2d 297, 301 (4th Cir. 1990); <u>Mays v. City of Dayton</u>, 134 F.3d 809, 816 (6th Cir.) ("[w]e reiterate that except in the <u>very</u> rare case where the defendant makes a strong preliminary showing that the affiant <u>with</u> <u>an</u> <u>intention</u> <u>to</u> <u>mislead</u> excluded critical information from the affidavit, and the omission is critical to the finding of probable cause, <u>Franks</u> is inapplicable to the omission of disputed fact") (emphasis in original), *cert. denied*, 524 U.S. 942 (1998); <u>United States v. Lievertz</u>, 247 F.Supp.2d 1052, 1058(S.D.Ind. 2002) ("[o]nly in rare instances is a <u>Franks</u> hearing merited when facts have been omitted in a warrant application"). As our Court of Appeals has noted, a reviewing court must give an affidavit a "sensible and pragmatic reading,"that takes into account the totality of the circumstances, including the fact that affidavits are normally drafted by non-lawyers in the midst and haste of a criminal investigation. <u>United States v. Watts</u>, 540 F.2d 1093, 1097 (D.C. Cir. 1976), *citing* <u>United States v.Ventresca</u>, 380 U.S. 102, 108 (1965); accord <u>Illinois v. Gates</u>, 462 U.S. 213, 235 (1983).

The defendant avers in general that the affidavits falsely conclude that normal investigative procedures were not producing results in order to obtain both the text-messaging and wiretap warrants.[4]  This reasoning is an exhaustion and necessity argument relevant to a Title III challenge, but of no moment to the search of store text-messages, and will be addressed as such below.  The defendant's remaining <u>Franks</u> contentions can be characterized as claims of omissions that Agent Yanta used to deliberately put a particular spin on the facts in order to mislead the Court.  This argument proceeds as follows: (1) S.A. Yanta omitted details concerning the context of Jones's club; (2) S.A. Yanta omitted details concerning the legitimate relationships betwixt Jones and his associates; (3) S.A. Yanta omitted pertinent details concerning phone activation figures; and (4) in the August 18th Affidavit, S.A. Yanta omitted details concerning the context of several text messages.

To begin, defendant's contention that S.A Yanta omitted details concerning the context of Jones's club are false.  The affidavit contains statements such as "Antoine Jones is the sole proprietor of a nightclub named "Levels," which is located at 1960 Montana Avenue, N.E., Wahsington D.C."  August 10th Affidavit at 7.  Investigators believed that Jones used his business as a location where he could conduct his drug trafficking activities, as well as launder drug trafficking proceeds, based, *inter alia*, on information from three separate confidential informants that suggested Jones was using his "legitimate" business for this purpose.  Similarly, from at least one source, investigators learned that Jones employed Lawrence Maynard as both his "A.B.C. manager," and an assistant in the cocaine-trafficking business.  <u>Id</u>. at 7.  Aside from

---

[4]The Court of Appeals has observed that sections of an affidavit framed in conclusory terminology "cannot rationally be separated from . . .preceding detailed descriptions of . . .investigative events." <u>United States v. Williams</u>, 580 F.2d 578, 589 (D.C. Cir. 1978).

that, the investigators were not aware of, and indeed had no reason to be aware of, any addiitional individuals who had similarly dual-employment.  Further, there is nothing exculpatory about the fact that some of the conspirators were also "employees" of Levels.  The defendant's claim that S.A. Yanta omitted details concerning the "legitimate" personal and business relationships between Jones and his associates is unsubstantiated and indeed unsubstantiatable – the affidavit contained pertinent information regarding Jones's suspected associates in his drug-trafficking business.  That other individuals with connection to Levels were also intercepted on Jones's cellular telephone discussing cocaine trafficking does not in any way support defendant's claim that S.A. Yanta purposely failed to include information about them.  It merely means just that – that they were unknown to investigators at the time S.A. Yanta applied for the wire interception.

Further, the defendant's contention that his personal relationships would explain his contact with numerous individuals known to have colorful histories of narcotics offenses falls flat.  Given the context of running a front organization for trafficking drugs, not only is it unsurprising that Jones would have close personal and business ties to his confederates in crime, it would be expected.  Indeed, as S.A. Yanta asserts "Jones maintain[ed] a discreet operation, and limit[ed] his contacts to individuals known to him personally, or introduced to him by trusted, well known associates."  Id. at 7.  S.A. Yanta's efforts do not constitute cherry picking, but rather an organization of pertinent facts.

The defendant also contends that the number of activations between Maynard's number and Jones's number is consistent with their operation of a nightclub and with their long-term friendship.  While this may be so, it remains significant that Jones's nightclub, of which Maynard was a "manager," was a front for his drug trafficking activities and that both individuals have

18

narcotics related histories.  The same can be said for all of the phone activations the defendant

cites.  While the total number of activations in and of itself might be subject to several readings,

given the context of the confidential sources and evidence obtained through independent

surveillance, it becomes apparent that trafficking drugs was exactly the business this nightclub

manager was involved in.  As S.A. Yanta correctly intuited, the 17,908, activations made by

Maynard during the surveillance period were consistent with the use of a cellular telephone to

facilitate narcotics trafficking.  Id., at 23.

Lastly, the defendant argues that S.A. Yanta intentionally misled the court in the August

18th Affidavit when she failed to describe several text messages which may have lent those

messages included in the affidavit an alternative interpretation.  Specifically, defendant alleges

that Maynard's message "My man is back up working with a monster" is sexual in nature and

that agent Yanta's failure to include other more explicit messages on the same date to this

number misstates the message's context.  To begin, it bears repeating that narcotics traffickers

tend to use innocuous terms in order to reference their drug activities.  Hiding a coded message

within the context of a "sexual relationship" is almost ideal for letting an established customer

know that a new shipment of cocaine had arrived and was available for purchase.  These "sexual"

messages, involving the terms "working with a monster,"were sent to several different phone

numbers all registered or known to be used by persons with narcotics histories.  While it is true

that S.A. Yanta did not transcribe some of the messages exactly as they were texted, forgetting a

smiley face here or there and confusing one of several calls referring to a monster with another,

these typographical errors were just that, and not the grossly material misstatements the

defendant would have this Court believe them to have been.  The context of the "sexual

19

relationship" cannot hide the fact that over the course of six minutes on August 6, 2005, Maynard sent a series of five text messages to different telephone numbers, all with identical content: "Good Morning!!!". The coded content of these messages was confirmed by CS-1's prior assertions that Maynard and Jones would frequently use codes such as "in the morning for breakfast" to indicate that the most recent shipment of cocaine had arrived, and was available for pickup. All of the messages referring to "working with a monster" and "Good Morning!!!" occurred at the beginning of the month, when Jones was believed to receive his shipments.

Thus, while S.A. Yanta certainly did not detail every known fact about the defendants and may have made some mistakes in her affidavit, none of these mistakes or omissions amounted to the kind of misstatement that reaches the standard set by <u>Franks</u>.

d. <u>S.A. Yanta did not make any false statement knowingly or with a reckless disregard for the truth.</u>

     The defendant cannot prove, much less substantially prove, that Special Agent Yanta made a false statement with the requisite scienter. An integral part of the <u>Franks</u> test is the consideration as to whether the affiant, in the totality of the circumstances, tried to deceive the judge intentionally or manifested a reckless disregard for the truth. This Circuit has held that a reckless disregard for the truth is a subjective standard that requires a showing that the affiant "entertained serious doubts as to the truth of [her] publication." <u>United States v. Davis</u>, 617 F.2d 677, 694 (D.C. Cir. 1979) (despite the Supreme Court's declination to define what constitutes reckless disregard for the truth in situations such as <u>Franks</u>, precedents in the area of libel and the First Amendment serve an analogous protection in Fourth Amendment cases), *citing* <u>St. Amant v. Thompson</u>, 390 U.S. 727 (1968). This may be met either by showing actual deliberation or by

demonstrating that there existed obvious reasons for the affiant to doubt the veracity of the information she submitted.  Id.

    As the defendant aptly notes, there is a presumption of validity with respect to affidavits supporting search warrants.  Franks, 438 U.S. at 164 (a challenge to a warrant's veracity will be permitted but the challenge "surely takes the affiant's good faith as its premise"); see also Richardson, 861 F.2d at 293-94 (the burden is on the defendant to show that the affiant behaved in bad faith and not on the affiant to prove her good faith).  Thus, even if the defense can prove that some misstatements or omissions were made that amount to false statements, they offer no proof that S.A. Yanta did so with the requisite scienter.

        e.   Even without the contested portions, the affidavit satisfied probable cause.

    When assessing probable cause for warrants, the task of the issuing magistrate is simply to make a practical decision whether, given all the information set forth in the affidavit, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. Illinois v. Gates, 462 U.S. 213, 238-39 (1983), citng Jones v. United States, 362 U.S. 257, 271 (1960).  The Gates Court embraced a totality of the circumstances approach to probable cause that placed emphasis on "the factual and practical considerations of everday life on which reasonable and prudent men, not legal technicians, act." Id. at 231, quoting Brinegar v. United States, 338 U.S. 160, 175 (1949).  As the Court made clear, the evidence need not be infallible; small inaccuracies will not undermine the probative value of the information as a whole if other indicia of reliability are present.  Id, at 245.  Moreover, a reviewing court is not to determine the sufficiency of an affidavit de novo; rather great deference is to be paid to a magistrate's determination of probable

21

cause.  Id. at 236, *citing* Ventresca, 380 U.S. at 108 (a negative attitude towards warrants is inconsistent with the Fourth Amendment's preference for searches conducted pursuant to a warrant).

Looking at each affidavit as a whole, it is clear that S.A. Yanta was thoughtful in her preparation, and did not act to deceive the court or with a "reckless disregard" for the truth. The physical surveillance when combined with the information provided by the confidential sources and traffic stop, certainly showed that Jones and Maynard were operating more than just a nightclub.

The physical and video surveillance revealed a high volume of traffic in and out of Jones's club during its non-operational hours.  August 10th Affidavit at 21.  While this evidence by itself does not inculpate the defendant, when combined with information from the Confidential Informants, it certainly informs probable cause.  For example, agents specifically noted that those observed entering and exiting the building were carrying backpacks like the ones CS-1 described as being used to transport cash payments and drugs.  Id. at 17, 21.

The law in this Circuit is clear that when an affidavit relies on a confidential informant to provide probable cause, a magistrate may rely on a recital that the informant had previously given correct information, without requiring further factual elaboration of past reliability.  See United States v. Bruner, 657 F.2d 1278, 1297 (D.C. Cir. 1981).  Before introducing each of the informants, the affidavit establishes their credibility for providing accurate information.  August 10th Affidavit at 10, 14, 17.  As such, the informants' independent statements make it clear that Jones was the leader of a narcotics organization.  In addition, the completely separate incident of the traffic stop in North Carolina provided ample probable cause to suspect Jones of trafficking

activities and using his phone to faciliate that activity.

Finally, the alleged "omissions" Special Agent Yanta made were immaterial to the investigation at hand.  Agents were well aware of the fact that Jones was operating a nightclub and S.A. Yanta stipulated such within the affidavit.  In light of all the evidence, the slight possibility that Jones was only engaged in legitimate nightclub activities did not undermine probable cause that he was running a cocaine business.

### C.  The Title III Argument

The defendant premises his claimed entitlement to a <u>Franks</u> hearing regarding the suppression of the Title III wiretap evidence on the grounds that the text messaging warrants should never have been granted, and that had these text messaging warrants been denied, there would have been no probable cause to issue the subsequent wire tap warrants. However, not only was there adequate probable cause to support the text messaging warrants, but both the text messaging warrants, the wiretap, and the wiretap extension independently satisfied all three prongs of <u>Franks</u>.  In addition law enforcement officers conducted the wire taps according to Title III's necessity and minimization requirements.

### 1.  Background

On Sept. 2, 2005, the United States applied for an Order from the Honorable Paul L. Friedman, of this Court, authorizing the interception of communications occurring to and from the cellular telephone used by Antoine Jones.  The application for authorization to intercept communications to and from the target telephone was supported by probable cause to believe that the phone was being used to further Jones's narcotics trafficking operations.  That day Judge Friedman issued an order authorizing electronic surveillance for a period of thirty (30) days.

23

Electronic surveillance began shortly after the issuance of the order on September 2, 2005, and on September 30, 2005, at the government's request, Judge Friedman authorized an extension of the interception period for an additional 30 days, pursuant to Section 2518 of Title 18, United States Code.  On October 24, 2005, law enforcement terminated the Jones intercept.

   2. The First Affidavit

   Although the first Title III affidavit by Special Agent Yanta  in many ways reflects much of the information that was in the affidavits for text messages it is important to focus on the goals of the investigation described in that affidavit and the facts supporting a wire intercept as the best tool to achieve those goals.

   a. Goals

   As described on pages 2 -3 of Judge Friedman's September 2, 2005, Order Authorizing the Interception of Wire Communications, the aim was far more than just a successful criminal prosecution of Antoine Jones himself.  The investigation was attempting to identify, among other things, "the means and manner by which individuals are obtaining and redistributing large quantities of cocaine in various locations in the United States," the "identities and roles of participants in the illegal activities, including accomplices, aiders and abettors, co-conspirators," the "source of the controlled substances," the operations of the organization including "the methods of distribution and possession of said controlled substances and transfer of the contraband and money involved in those activities," the "methods of operation of laundering proceeds of illegal drug sales," the "location and source of the resources used to finance their illegal activities," "the location and disposition of the proceeds from those activities," and "the locations and items used in furtherance of those activities."

b.  <u>Probable cause</u>

As defendant notes, much of the probable cause section of the first wiretap affidavit contains information already covered by the text messaging affidavits.  <u>See</u> *supra* at pages 11-15. This information combined with intelligence gathered from and during the process of retrieving the text messages served as the basis for the first wiretap affidavit's probable cause.  The core of the probable cause section of the affidavit is at paragraphs 18-51.  It details a wide range of information demonstrating that Jones was involved in the drug trade and was likely using the target line to further his drug activity.

CS-1 reported having made multi-kilogram purchases of cocaine directly from Jones in the recent past, transactions that took place at a number of locations including Levels, Jones' club.  Although CS-1 was no longer purchasing drugs  from Jones at the time it provided this information, at that time it was in contact with individuals who themselves were purchasing cocaine from Jones and disclosing that activity to CS-1.  This information was supported by pen register data and text messages between Jones and these purchasers.  For example, in the past, CS-1 had purchased large quantities of cocaine from Donald Hunter, knowing that one of Hunter's sources was Jones.  In August of 2005, Hunter told CS-1 that Jones was once again dealing drugs after a hiatus related to supply problems.  Hunter stated that within the past week he had made a purchase of a half kilo of cocaine from Jones.  The pen register on the target line showed a flurry of calls between Jones and Hunter at that time.

CS-1 had also learned from Jones and Lawrence Maynard that Maynard on occasion made trips to pick up drugs from Jones's source, to whom Jones referred as "the Mexicans," in Texas.  This information was corroborated by an April 2005, traffic stop by the state police in

25

North Carolina of a vehicle registered to Jones and driven by Maynard. A search of the vehicle revealed over $67,000, in cash in a hidden compartment.

CS-2 had also purchased kilogram quantities of cocaine from Jones. CS-2 also knew a number of other drug dealers who where supplied by Jones. Although CS-2 had never personally engaged in drug transactions in Jones's night club, it was aware from other drug associates that deals did occur there on occasion.

CS-3 was in direct communication with Anthony Koonce who told CS-3 that he was buying multi-kilogram quantities of cocaine from Jones. CS-1 also was aware that Annette Bigesby, a past drug associate of Jones, had provided both Jones with verification of false employment at her hair Salon for parole purposes, information verified by parole records. Similarly, Koonce provided Bigesby's hair salon as his "employment" for his parole records as well, tightening the link between Jones and various current and former cocaine customers.

Surveillance of Jones and Levels showed that a number of the individuals the informants linked to drug activity with Jones were in frequent contact with him. Pen register data verified that the target line was in contact with phones used by these individuals as well as a number of others with drug convictions or histories of drug activity. There were also several suspicious text messages between the target line and potential drug purchasers.

c.  Alternate Techniques

The affidavit at paragraph 93 lays out the limitations of other techniques that might have been used to further the investigation.

Physical surveillance had inherent limitations since it was "unlikely to establish conclusively the roles of the named conspirators, [or] to identify additional conspirators." Surveillance could confirm "that some of the identified members of the conspiracy associate with one another" but that hardly would build a case with proof beyond a reasonable doubt.

Undercover operations were limited because it was unlikely that Jones would deal with an undercover officer, nor were the government's sources in a position to introduce an undercover officer or to make drug buys directly from Jones. Even if they could have made such a purchase, such operations were unlikely to reveal fully the "relationship among Antoine Jones, Maynard and other co-conspirators, or the full scope of the illegal drug operation, including the extent of their dealings with each other, the identification of other persons who may be involved in the operation, as well as the disposal of proceeds from the illegal drug business."

Pen register and air time records, while useful in "establishing relationships and patterns of operation . . . provide little direct evidence of the significance of the telephone calls." In short "without access to the content of the conversations, law enforcement agents [could] not know definitively whether calls to the target cellular involve drug customers or other conspirators."

The confidential sources who provided much of the probable cause for the affidavit had information that was chiefly "historical in nature." They also lacked full knowledge of "the sources of supply, the full scope of the organization, [and] neither [knew] all the members of the organization." Additionally, neither of the informants who had dealt with Jones in the past were "in a position to make a controlled narcotics purchase from either Antoine Jones or any of his associates."

27

Search warrants, while providing some useful information, would "alert the subjects to the existence of the investigation and would prevent the identification of other co-conspirators and/or the seizure of contraband." "In addition, use of search warrants would not be likely to reveal the total scope of the illegal operation and the identities of the co-conspirators." And search warrants would have been of particularly limited use since the agents did "not know the locations where illegal drugs are distributed and stored by Antoine Jones and the Target Subjects in the greater Metropolitan Washington, District of Columbia area."

Grand Jury subpoenas and witness interviews would "not likely result in the gathering of sufficient evidence to uncover the full scope, nature, or identities of all the participants in this criminal conspiracy." Interviews and Grand Jury appearances also would run the risk that those interviewed would reveal the ongoing investigation to the targets with the risk that they would then become "more secretive and ... attempt to further disguise or hide the criminal activities [described in the affidavit]."

### 3. The Defendant's Attack On Probable Cause

Jones's attack on the probable cause portion of the affidavit is already addressed above at 15-23, in the section of this response dealing with the challenges to the affidavits in support of the search of the text-messages.

### 4. The Exhaustion and Necessity Requirement

The defendant contends that law enforcement officers did not meet Title III's exhaustion and necessity requirement because they failed to conduct all other types of operations before applying for authorization to resort to the use of wire taps. Specifically defendant alleges that surveillance at Jones's and his confederates' homes was minimal and that no controlled drug buy

28

had been attempted.  However, Title III does not require that law enforcement personnel execute every type of conceivable operation before resorting to electronic surveillance.

a.    The legal requirement

Title 18 U.S.C. §2518(1)(a) provides that each application for an order authorizing electronic surveillance must contain:

> A full and complete statement as to whether or not other
> investigative procedures have been tried and failed or why they
> reasonably appear to be unlikely to succeed if tried or to be too
> dangerous.

Similarly, prior to granting an order authorizing a wiretap, an issuing judge must find, among other things, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. §2518(3)(c).  These prerequisites to a wiretap are commonly known as the "exhaustion" requirement.

The purpose of the statutory exhaustion requirement is to ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime," and to inform the issuing judge of the difficulties inherent in the use of traditional techniques.  United States v. Kahn, 415 U.S. 143, 153 n.12 (1974). But "the burden that these provisions impose upon the government to show the inadequacy of normal investigative techniques is not great, and the adequacy of such a showing is to be tested in a practical and common sense fashion." United States v. Anderson, 542 F.2d 428, 431 (7th Cir. 1976); *accord*, United States v. Armocida, 515 F.2d 29, 38 (3rd Cir.), *cert. denied*, 423 U.S. 858 (1975); United States v. Webster, 473 F. Supp. 586, 595 (D.Md. 1979) (statutory burden on the government is

29

not great in showing compliance with exhaustion requirement), *aff'd*, 639 F.2d 174 (4th Cir.), *cert. denied*, 454 U.S. 857 (1981), *modified on other grounds*, 669 F.2d 185 (4th Cir. 1982), *cert. denied*, 456 U.S. 935 (1991); United States v. Askins, 351 F. Supp. 408, 414 (D.Md. 1972) (government's burden of establishing exhaustion is not great).

Moreover, 18 U.S.C. § 2518(c) does not require the literal exhaustion of all normal investigative techniques. United States v. Carter, 449 F. 3d 1287, 1293 (D.C. Cir. 2006) ("the government will meet its burden of demonstrating necessity if it shows that 'other techniques' are impractical under the circumstances and that it would be unreasonable to require pursuit of those avenues of investigation."); United States v. Clerkley, 556 F.2d 709, 715 (4th Cir. 1977) ("police need not exhaust every conceivable technique before making application for a wiretap"), *cert. denied*, 436 U.S. 930 (1978). The statute requires only "'that the agents inform the authorizing judicial officer of the difficulties inherent in the use of normal law enforcement methods.'" United States v. Torres, 901 F.2d 205, 231 (2d Cir.) (citations omitted), *cert. denied*, 498 U.S. 906 (1990); United States v. Sobamowo, 892 F.2d 90, 93 (D.C. Cir. 1989) (the government is not required to enumerate in its affidavit every technique or opportunity missed or overlooked), *cert. denied*, 498 U.S. 825 (1990). Rather, the government need show only that other techniques would be impracticable. United States v. Johnson, 696 F.2d 115, 123 (D.C. Cir. 1982); United States v. Garcia, 785 F.2d 214, 223 (8th Cir.) ("affidavit need not explain away all possible alternate techniques because investigators are not required to use wiretaps or eavesdropping devices only as a last resort"), *cert. denied*, 475 U.S. 1143 (1986). A "standard of reasonableness should be employed in measuring the affidavit against the statutory requirements." United States v. Oriakhi, 57 F.3d 1290, 1298 (4th Cir. 1995) (showing of

30

necessity is "'to be tested in a practical and commonsense fashion,' . . . that does not 'hamper unduly the investigative power of law enforcement agents'" (citations omitted), *cert. denied*, 516 U.S. 952 (1995).

The Court of Appeals for this Circuit has recognized and applied the above-cited principles. United States v. James, 494 F.2d 1007, 1016 (D.C. Cir. 1974), *cert. denied* 419 U.S. 1020 (1974) ("Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely [to succeed]"). The Court has said that even though merely conclusory statements about necessity will not suffice, even conclusory statements "cannot rationally be separated from . . . preceding detailed descriptions of . . . investigative events." United States v. Sobamowo, 892 F.2d 90, 93 (D.C. Cir. 1989), *quoting* Williams, 580 F.2d at 589.

      b.  The requirement was more than met by Special Agent Yanta's Affidavit

In light of the contents of Special Agent Yanta's Affidavit and the relevant law, little needs to be said in response to the defendant's rather muddled contentions. Still a brief comment on the nature of his attacks illustrates why they are groundless, particularly since they are all arguments based on the facts in the affidavit, which were doubtless given whatever weight they might deserve by the experienced district judge who approved the interception, and whose judgment in this matter is entitled to considerable deference. Carter, *supra*, 449 F.3d at 1294-95 (defendant "fails to demonstrate that the district court abused its discretion in finding the government had met its burden to demonstrate the wiretaps of his cell phone were necessary under 18 U.S.C. § 2518(1)(c)"); United States v. Zambrana, 841 F.2d 1320, 1329-30 (7th Cir. 1988) ("[I]n reviewing a challenge to 'necessity' of a wiretap, [reviewing courts] apply an abuse of discretion standard, giving substantial deference to the determination of the issuing judge.");

31

<u>United States v. Daly</u>, 535 F. 2d 434, 438 (8th Cir. 1976) (in reviewing finding of exhaustion "as in other suppression matters, considerable discretion rests with the judge to whom the wiretap application is made").

The essence of the investigative goal  furthered by the Title III intercept as articulated in the affidavit, and doubtless understood by Judge Friedman, was to take out the entire Jones organization by developing evidence that could lead to a prosecutable case.  This included identifying the source(s) of supply, the stash locations used by the organization, the full membership of the conspiracy and the flow of money as it moved through the organization. <u>See</u> September 2, 2005, Order at 2-3.  The exhaustion requirement merely means that an applicant for an intercept must show that even if a particular technique might theoretically achieve these goals it is not "likely" to do so.  <u>James</u>, *supra*, 494 F.2d at 1016.

(1) <u>Surveillance</u>

In attacking the probable cause for the intercept, the defendant charges that Special Agent Yanta failed to describe the legitimate business dealings that would have explained the innocent relationship between Jones and the wide array of convicted drug dealers with whom he was observed associated.  Nonetheless, he also claims that further surveillance should have been done at Levels, apparently on the theory that during public events kilos of cocaine were being sold in the open, and at the homes of the targets to develop more information about their movements. Jones' Surveillance Motion at 17, 22.  However this in no way responds to the point made by Special Agent Yanta that this simply would not be evidence that could lead to proof beyond a reasonable doubt as to any criminal activity.

(2) <u>Pen registers</u>

Again, with a certain degree of confusion, Jones argues both that pen register data was meaningless because of the business association of the targets, but conversely that the agents should have pursued it further because of the investigative benefits it would yield. Jones' Surveillance Motion at 17, 22   The defendant again fails to explain how this contradicts Special Agent Yanta's logical conclusion that while pen register data might help establish relationships, it could not disclose the content of calls and thus could not lead to evidence that would prove the government's case beyond a reasonable doubt.

(3) <u>Confidential informants</u>

Further, although Jones contends that the informants in the case could have made purchases from him, Special Agent Yanta explained why that was not feasible.  Jones argues that the government could have obtained the release of incarcerated informants in an attempt to make buys from him.  Jones Motion at 23.  But the "police need not exhaust every conceivable technique," <u>Clerkley</u>, *supra*, 556 F.2d at 715, and imposing an obligation to release prisoners seems to be far more than the exhaustion requirement intends.  In addition, this claim is perhaps disingenuous, as cocaine dealers, especially those with the experience of Jones, hesitate to sell drugs to individuals recently released from Jail, for precisely this reason – that it may be a setup. Finally, none of the informants had anything but the vaguest knowledge about the identity of Jones's source(s) or the location of his assets, the discovery of which were legitimate and articulated goals of the investigation and the intercept.

(4) Grand jury and search warrants

Again Jones simply asserts, without exposition, that witnesses could have been interviewed in the Grand Jury, and that this, along with search warrants and other techniques, would have revealed the full scope of the conspiracy.  This is simply Jones's unsupported opinion and not one apparently shared by Judge Friedman. See Carter, supra, 449 F.3d at 1294 (while execution of a search warrant might have incriminated one member of the conspiracy, it would also have alerted his co-conspirators and thus was not an alternate technique that had to be pursued prior to seeking a Title III intercept).

There is thus absolutely no basis to disturb the decision of the issuing judge that the "exhaustion" requirement was satisfied.

c.  The Wiretap Extension

Jones makes no specific challenges to the extension of the wire intercept.

d.  Minimization

With respect to the implementation of the intercept, Jones challenges the degree to which intercepted conversations were appropriately minimized.  Jones' Surveillance motion at 25-26. The defendant points to no specific conversations he claims should have been minimized but were not.  Rather, the most he does is allege that the government should have minimized all conversations between the targets "pertaining to their joint business ventures as well as social or other matters unrelated to a drug distribution conspiracy."[5]

---

[5] Since the essence of a drug conspiracy is making money, it is a bit difficult to understand why Jones suggests it was improper to monitor conversations concerning what the targets were doing with their money.  This is particularly true in light of the fact that there was evidence that Levels was being used to launder drug proceeds (September 2 Affidavit at paragraph 14), and that the goals of the investigation and the intercept included tracing money

Allegations of this type are wholly inadequate to trigger any obligation on the government to respond or the Court to inquire further, which was made clear by the Court of Appeals barely a month ago in <u>United States v. Carter</u>, 449 F.3d 1287, 1295 (D.C. Cir. 2006). The defendant in <u>Carter</u> challenged a wire intercept by presenting evidence that only 27% of the non-pertinent calls in the intercept had been minimized. He also alleged that non-pertinent calls had been monitored, particularly conversations concerning golf, but pointed to no specific conversations. On that record Judge Urbina rejected the contention without any evidentiary hearing.

The Court of Appeals agreed since "[w]hat the wiretapping statute forbids is failure by the government to make reasonable efforts to minimize interceptions of non-pertinent communications; consequently, a defendant must identify particular conversations so that the government can explain their non-minimization. Having failed to identify 'specific conversations that should not have been intercepted, or even . . . a pattern of such conversations,' *the issue of reasonable minimization was simply not in play*." 449 F. 3d at 1295 (citation omitted) (emphasis added).

---

laundering activity and locating the profits of the drug enterprise. September 2 affidavit at paragraph 9(b); <u>see</u> <u>also</u> September 2 Order at 3.

### III.    MOTION TO ADOPT AND CONFORM TO CO-DEFENDANT'S MOTIONS

In his second motion, defendant Antoine Jones moves this Honorable Court for leave to adopt and conform to any motions filed by his codefendants – Adrian Jackson, Kirk Carter, Kevin Holland, and Michael Huggins.  However, because none of his codefendants have filed any substantive motions, and the deadline for filing has passed, this motion should be denied as moot.

### IV.    MOTION FOR A PRELIMINARY DETERMINATION OF CONSPIRACY AND PRETRIAL RULING ON THE ADMISSIBILITY OF CO-CONSPIRATOR'S STATEMENTS

Defendant Jones moves this Court for a pretrial hearing to determine whether a conspiracy existed in this case, and to determine the admissibility of statements of alleged co-conspirators pursuant to Fed. R. Ev. 801(d)(2)(E).  However, he does not, indeed he can not, provide the Court with a legal basis to support this request.

Federal Rule of Evidence 801(d)(2)(E) provides that statements of co-conspirators made in furtherance of the conspiracy are not hearsay.  Such a statement is admissible against all coconspirators.  United States v. (Joseph) Jackson, 627 F.2d 1198, 1216 (D.C. Cir. 1980).  To admit such statements, the government need only prove by a preponderance of the evidence that a conspiracy existed between the defendant and the declarant and that the statement was made in furtherance of the conspiracy.  United States v. Beckham, 968 F.2d 47, 51-52 (D.C. Cir 1992), citing Bourjaily v. United States, 483 U.S. 171, 175 (1987).

The defendant cites no case holding that the Court must decide the admissibility of co-conspirator statements in advance of the trial. Indeed, appellate courts have routinely upheld the practice of deferring the determination of a defense motion until the trial if that motion requires "deciding issues of fact that are inevitably bound up with evidence about the alleged offense itself." United States v. Wilson, 26 F.3d 142, 159 (D.C. Cir. 1994), *cert. denied,* 514 U.S. 1051. In United States v. Gantt, 617 F.2d 831, 845 (D.C. Cir. 1980), under circumstances nearly identical to the present case, the D.C. Circuit upheld the trial court's refusal to hold a pretrial hearing into the existence of a conspiracy so as to determine admissibility of statements under the coconspirators' exception to hearsay rule. The court explained that "[a]s a practical matter, to avoid what otherwise would become a separate trial on the issue of admissibility, the court may admit declarations of coconspirators 'subject to connection.'" Id.; see also Jackson, 627 F.2d at 1218, which, contrary to defendant's assertion (Jones Omnibus Pretrial Motion at 3), held that trial courts are not required to hold "mini-trials" on the conspiracy issue before the conditional admission of a coconspirator's statements.

In light of these considerations, the Court should reject the defendant's request for a pretrial hearing relating to coconspirator statements. To determine pretrial whether a particular statement meets the elements for the admission of coconspirator statements, the Court would essentially have to conduct a trial before the trial. Rule 801(d)(2)(E) requires the government to prove both that the conspiracy exists and that the statement was made in furtherance of the conspiracy. Much of the government's evidence at trial will be presented to prove the existence of the narcotics conspiracy. Indeed, the Indictment filed in this case includes 94 overt acts in furtherance of the narcotics conspiracy. The trial itself is likely to last two months or more. It

37

would be a waste of judicial resources to present this evidence twice in order to resolve the question of coconspirator statements in advance of trial. Neither the federal rules nor prior cases require that the Court undertake such an exercise.

### V. MOTION FOR DISCOVERY OF CO-DEFENDANT AND CONSPIRATOR STATEMENTS

Jones moves the Court for an order directing the government to provide discovery of any statements that the government intends to offer against him pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence. This motion is without merit.

This Circuit has expressly held that:

> we are without authority to order such discovery. Nothing in the Federal Rules of Evidence or in the Jencks Act requires such disclosure – we think it clear that as used in Fed. R. Crim. P. 16(a)(1)(A) the phrase "statements made by the defendant" does not include statements made by co-conspirators of the defendant, even if those statements can be attributed to the defendant for purposes of the rule against hearsay. Once appellant's imaginative reading of 16(a)(1)(A) is rejected, no other authority is suggested for this type of discovery order. Under our law, the adversary system is "the primary means by which truth is uncovered." Bagley, 473 U.S. at 675. We decline to extend the defendant's right to discovery beyond that required by statute or the Constitution. We note this result is in agreement with every other circuit that has examined the question.

United States v. Tarantino, 846 F.2d 1384, 1418 (D.C. Cir. 1988), *cert. denied*, 488 U.S. 867 (1989); accord United States v. Orr, 825 F.2d 1537 (11th Cir. 1987); United States v. Roberts, 811 F.2d 257 (4th Cir.1987) (*en banc*); United States v. Percevault, 490 F.2d 126 (2nd Cir. 1974). The government will, of course, disclose such statements to the extent disclosure is required by the Jencks Act or Brady.

The cases from other Circuit Courts of Appeals upon which the defendant relies similarly do not support his request.  See United States v.  Disston, 612 F.2d 1035, 1037 (7th Cir. 1980), (Rule16(a) of the Federal Rules of Criminal Procedure applies only to statements of a defendant, and under certain limited circumstances, those of co-defendants; statements of coconspirators are not implicated): see also Percevault, supra, 490 F.2d at 132 (in ordering the government to turn over co-conspirator statements prior to trial, the trial court exceeded its "authority in compelling pretrial disclosure of statements made by prospective government witnesses"); United States v. McMillen, 489 F.2d 229 (7th Cir.  1972) (court issued a writ of mandamus to deny the defense access to a co-conspirator's statements until he testified at trial).

### VI.     MOTION TO DISCLOSE IDENTITIES OF EACH CONFIDENTIAL INFORMANT REGARDLESS OF WHETHER THEY WILL BE CALLED AT TRIAL

Defendant Jones moves this Court to order the United States to provide to him the names of, and make available to him, any informants, co-conspirators, and witnesses who have provided incriminating information against him, whether or not the government intends to call them at trial.  This motion should be denied.

The government enjoys a qualified, though "time-honored," privilege to withhold the identity of its informants from criminal defendants.  Roviaro v. United States, 353 U.S. 53 (1957);  United States v. Brodie, 871 F.2d 125, 128 (D.C. Cir. 1989).  In making the determination whether disclosure of a witness's identity to a defendant is necessary, the Court must balance the public's interest in law enforcement and protecting the informant's identity against the defendant's right to prepare a defense.  Roviaro, 353 U.S. 53, 62; United States v.

Warren, 42 F.3d 647, 654 (D.C. Cir. 1994). The defendant bears the heavy burden of proving that disclosure of the informant's identity is necessary and relevant to the defense. Warren, 42 F.3d at 654; United States v. Staufer, 38 F.3d 1103, 1109 (9th Cir. 1994); United States v. Khosravi, 733 F. Supp. 137, 138 (D.D.C. 1990). More specifically, the defendant must allege how the informant will help establish his or her innocence; mere conclusory or speculative pleadings will not suffice. United States v. Skeen, 449 F.2d. 1066, 1071 (D.C. Cir. 1971). The defendant offers no such specificity here; rather, he merely states in wholly conclusory fashion, that "[t]he identities of the informants are necessary to the defense in order to investigate bias, motives to fabricate and to cast doubt upon the credibility of certain witnesses." Def. Omnibus Pre-Trial Motion at 6. The same can be said of every case in which confidential informants are involved.

The disclosure of the informants' names, to the extent that Jones does not already know them, would expose the informants to danger in the violent drug community. The informants' identities are therefore being withheld for their safety. Courts will not order disclosure where disclosure will place an informant in personal danger and the prospective testimony is not exculpatory. United States v. Pelton, 578 F.2d 701, 707-08 (8th Cir. 1978). There is nothing exculpatory about the prospective testimony of any informant or confidential employee, nor does the defendant even allege that any prospective testimony will be exculpatory. The government will, of course, supply defense counsel at the appropriate time with all information, if any, relevant to cross-examination of an informant, consistent with its obligations under *Brady* and *Giglio*.

40

The government anticipates calling a number of witnesses at trial to testify about their knowledge of the defendant's criminal activities. Some of these witnesses participated with the defendant in the transactions that are charged in the indictment. The remaining witnesses will simply testify about the defendant's criminal activities based on personal observations. With respect to the latter witnesses, they clearly are not "participants in transactions" within the meaning of Roviaro, and, thus, their identities need not be disclosed. See United States v. Dark, 597 F.2d 1097 (6th. Cir. 1979) (government not required to disclose names of witnesses it intends to call at trial); United States v. Sclamo, 578 F.2d 888 (1st Cir. 1978) (purported need for disclosure generally to enable preparation for cross-examination does not constitute a sufficiently specific showing of materiality and reasonableness).

With respect to the identities of the cooperating informants who did participate in transactions with the defendants, the defendants are already aware of their identities. To the extent the defendants are not aware of the identity of those informants, their reliance on Roviaro to secure this disclosure is misplaced. Roviaro arose out of a situation in which the informant who participated in the charged offense was neither made available to the defendant nor testified at trial. See, e.g., United States v. Foster, 815 F.2d 1200, 1202-03 (8th Cir. 1987) (denial of defendant's motion to disclose informant's identity proper where informant testified at trial and was subject to cross-examination); see also United States v. Edwards, 47 F.3d 841, 843-44 (7th Cir. 1995) (no disclosure of identity required until immediately before testimony because witness faced substantial danger and defendant was not prejudiced).

**VII.    MOTION FOR AN ORDER DIRECTING THE GOVERNMENT TO SPECIFY ALL EVIDENCE WHICH MAY BE SUBJECT TO SUPPRESSION**

The defendant has filed a motion asking the Court to order the government to specify all evidence which may be subject to suppression.  Because the Court has already ordered the government to do this very thing – and the government has complied – this argument is moot.

On April 21, 2006, the Court ordered the government to provide to the defendants notice by June 5, 2006, of all the evidence we would seek to introduce at the October 16, 2006, trial.  As ordered, on June 5, 2006, the government filed a 21-page itemization of evidence in nine different categories – (1) wiretap interceptions, (2) search warrant evidence, (3) video surveillance of the Ft. Washington, MD, stash house, (4) video surveillance of Levels nightclub, (5) documents from the 2004 Maryland ICE investigation, (6) documents pertaining to the April 5, 2005, traffic stop of Lawrence Maynard in Jones's minivan, (7) pen register data from the cellular telephones of Jones and Maynard, (8) GPS data from Jones's Jeep Grand Cherokee,[6] and (9) text messages from the cellular telephones of Jones and Maynard – it intended to rely on at trial.  As we noted in that submission, this itemization was necessarily overinclusive because it was produced more than four months prior to trial.  As the case is pared down, we will alert counsel for the defendants to those items of evidence which we do not anticipate relying upon at trial.  Through these measures, the government has given the defendant more than sufficient notice of the types of evidence that he might chose to move to suppress.  Indeed, this is more

---

[6]    While we have yet to designate which specific data points we will use from the GPS data, we note that Jones has a complete set of all the data, along with the application and order authorizing the government to install a GPS device on Jones's Jeep.  This is all the information that Jones needs to file any motion to suppress that evidence, which, notably, he does in his omnibus pretrial motion, and supplemental submission.

than the Rules require.

### VIII.    MOTION TO SUPPRESS TANGIBLE EVIDENCE OBTAINED FROM JEEP CHEROKEE AND LEVELS NIGHTCLUB

Antoine Jones moves this Court to suppress evidence seized during the execution of search warrants at his home, his Jeep, and the nightclub Levels, on the ground that the search warrants were deficient and that the police acted unreasonably in executing the warrants. Because (1) the affidavits contained sufficient probable cause to search, (2) the agents relied in good faith thereon, and (3) the agents conducted the searches in an appropriate and legal manner, the defendant's motions should be denied.

#### A.    Factual Background

On October 21, 2005, Special Agent Stephanie Yanta, of the FBI, obtained search warrants for nine different locations in the State of Maryland, and Detective Norma Horne, of the Metropolitan Police Department, obtained a search warrant for a nightclub in the District of Columbia – all of which were linked to the government's investigation into large-scale drug activity by Antoine Jones and his associates.[7]  Special Agent Yanta and Detective Horne submitted affidavits identical in all pertinent respects[8] to Magistrates in both jurisdictions, in support of all ten search warrants.  Both affidavits set forth detailed information concerning (1)

---

[7]    Copies of these warrants are attached to Jones's Omnibus Pretrial Motion and will not be refiled here.  In addition, in order to aid the Court in analyzing the parties' pretrial motions, in the coming days, government counsel and counsel for Jones intend to provide the Court with a jointly-produced binder of all materials upon which the parties have relied in these submissions.

[8]    The affidavits differed only in the identification of the locations to be searched.

the background and experience of the agents; (2) the locations to be searched and their

descriptions; (3) the extensive investigation that led up to the requested search warrants and that

established the requisite probable cause; (4) the reliability of the confidential informants who had

provided information contained in the affidavit; and (5) extensive excerpts from the wire

communications intercepted on Jones's cellular telephone.

The affidavits established that Jones, along with approximately 10 other individuals, were

engaged in a large-scale cocaine-trafficking conspiracy, with suppliers in Texas and Mexico.

Several different confidential sources had provided information about the defendants' drug

dealing activities in and around this jurisdiction (MD Aff. at xx; DC Aff. at xx), information that

was confirmed by wire interceptions on Jones's cellular telephone, beginning on September 2,

2005, and continuing through the day the search warrants were executed, October 24, 2005, and

surveillance attendant thereto (MD Aff. at xx; DC Aff. at xx).  Finally, the affidavit established

that drug dealers often keep or maintain records, weapons, drugs and drug paraphernalia, and

other evidence, and that such evidence is often kept in their business locations or their

residences.  Affidavits at 2-6.

### B.  The Affidavits Were Sufficient On Their Face

When assessing probable cause for warrants,

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

Illinois v. Gates, 462 U.S. 213, 238-39 (1983), *citing* Jones v. United States, 362 U.S. 257,

271 (1960). The issuing court's determination of probable cause "should be paid great deference by reviewing courts." Gates, 462 U.S. at 236 (citation omitted). Moreover, the reviewing court should recognize that affidavits for search warrants "must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleading have no proper place in this area." United States v. Ventresca, 380 U.S. 102, 108 (1965).

Applying these standards, it is clear that the information contained in the affidavits was sufficient to establish probable cause for both warrants in question. In fact, the information contained in the affidavits was deemed sufficient to establish probable cause by two reviewing magistrates from two different jurisdictions, Magistrate Deborah Robinson in the District of Columbia, and Magistrate Charles Day in Greenbelt, MD. While the defendant is correct that the search warrant affidavits relied on much of the same information as the wiretap affidavit, and evidence gleaned from the wire interceptions on Jones's telephone, this evidence further supports probable cause. Because the wiretap affidavit was proper, and the evidence that flowed therefrom was legally obtained, any reliance on wiretap evidence in the search warrant affidavits was similarly proper.[9]

---

[9]    The government adopts and incorporates by reference the response to the defendant's motion to suppress the wiretap evidence, set forth more fully at pages 6-35, *supra*.

## C.  **The Agents Executing The Warrants Relied On Them In Good Faith**

Even if the affidavits failed to establish probable cause, suppression of the evidence would not be an appropriate remedy if the officers conducting the search acted in "objectively reasonable reliance" on the warrants' validity.  United States v. Leon, 468 U.S. 897, 922 (1984). Ordinarily, the existence of a warrant is sufficient to establish that the officers acted in good faith in conducting the search.  _Id._  Suppression in such a case is appropriate only if "the magistrate abandoned his detached and neutral role" in assessing the affidavit or if "the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause."  _Id._ at 926.  The defendant alleges no facts to suggest that the information in the affidavits was false or made in reckless disregard for the truth; that the magistrate judges "wholly abandoned" their judicial role; or that the affidavit was so "lacking in indicia of probable cause" or so "facially deficient" that the executing officers could not reasonably rely on it.  Leon, 468 U.S. at 923 (citations omitted).  Thus, the Court should deny Jones's motions to suppress physical evidence taken from his Jeep and Levels nightclub on these grounds as well.

## D.  **The Warrants Were Properly Executed**

Jones alleges that during the execution of the search warrant on his residence, at 10870 Moore Street, Waldorf, Maryland, just after 6 a.m., on October 24, 2005, after he was "rudely awakened" by heavily armed federal agents, he was "presented . . . with a piece of paper . . . which turned [out] to be a consent form "to search his Jeep Cherokee, which he "felt no choice but to sign."  Def. Omnibus Motion at 14-15.  As such, he claims, his "consent was invalid

because it was not voluntary and was made under extreme duress." Id. [10] The defendant further

alleges that, in violation of Federal Rule of Criminal Procedure 41(f), the search agents did not

leave a copy of the warrant and the attachment at his residence. For these reasons, he asks this

Court to suppress the evidence taken from his Jeep – to wit, in excess of $69,000, in cash.

Because Jones's claims are wholly without basis in fact or law, they should be denied.

    1. Factual Background

On October 24, 2005, at approximately 6:01 a.m., a team of federal agents knocked on

the front door of 10870 Moore Street, Waldorf, Maryland, which was slightly ajar, announced

their presence, and that they had a search warrant. They waited several seconds, and then

knocked and announced a second time. Hearing no response, they entered the house. As they

did so, they observed the defendant, Antoine Jones, walk out of a second-floor bedroom and into

the hallway, and look down at the team entering the foyer. F.B.I. Special Agent Steve Naugle,

the team leader, ordered the defendant to get down onto the ground. Instead of complying with

this verbal command, the defendant walked back into the second floor bedroom, as S.A. Naugle

repeated his order for Jones to get down. The search team proceeded up the stairs, and into the

doorway of the bedroom, where S.A. Naugle observed the defendant place his hand under a pile

of clothes on the chair. The defendant then complied with the S.A.'s commands to get down,

and was arrested. Also present in the home, but not arrested, were Jones's wife and adult son.

---

[10]    Counsel notes that in a July 20, 2006, conversation with Eduardo Balarezo, Esq., counsel for the defendant, Mr. Balarezo stated that, in fact, the defendant's position is that he did not sign that paper at all, but rather, that his signature is a forgery. Obviously the government disputes this latest factual assertion, as it is utterly baseless and contrary to the evidence in the case. In the present section, we respond in more detail to the assertion in his pretrial pleading that he did, in fact, consent, but that such consent was coerced.

During the course of the ensuing search, as the defendant sat secured in his home, the agents presented him with a "Consent to Search" form authorizing them to search his "Jeep Grand Cherokee Laredo MD Tag: M664780," explained to him that they wanted to search his vehicle, and that he had a right to refuse consent. The defendant responded: "go ahead – you are going to get a search warrant anyway." As indicated on that form, the defendant signed it voluntarily, thereby "authoriz[ing] these agents to take any items which they determine may be related to their investigation." Relying on this authorization, the agents searched the Jeep, which was located in the garage attached to the house, and seized, among other things, the $69,000, in cash. After the search was completed, the search team left a copy of the warrant and the attachment with the defendant's wife, along with the seizure list, and explained to her what they were looking for and what they had seized.

2.    The search warrant authorized the search of Jones's Jeep Cherokee.

As an initial matter, the agents could have searched Jones's Jeep Cherokee, even without his consent, because as Jones himself acknowledges, his Jeep Cherokee was located in a garage attached to the premises at 10890 Moore Street, Waldorf, MD, for which a search warrant had been issued. Any vehicles parked within that garage were subject to search. United States v. Duque, 62 F.3d 1146, 1151 (9th Cir. 1995) ("a search warrant authorizing a search of a particularly described premises may permit the search of vehicles owned or controlled by the owner of, and found on, the premises") (citation omitted); United States v. Singer, 970 F.2d 1414, 1418 (5th Cir. 1992) ("this Court has consistently held that a warrant authorizing a search of 'the premises' includes vehicles parked on the premises").

### 3. The defendant's consent was voluntary

In order for a warrantless consensual search to be valid, the government bears the burden of proving that the consent was validly given.  See United States v. Lewis, 921 F.2d 1294, 1300 (D.C. Cir. 1990), *citing* Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).  The Lewis Court, citing Schneckloth, discussed the analysis of the voluntariness of consent in terms of the factors courts consider when assessing voluntariness of custodial statements, and noted that such an analysis "should focus on the particular individual rather than on the reasonable person." Lewis, 921 F.2d at 1301 (voluntariness depends on the totality of all the surrounding circumstances, including both the characteristics of the accused and the details of the interrogation).

Here, all the facts regarding both Jones himself, and the circumstances under which he gave consent, make clear that Jones voluntarily consented to the search of his Jeep.  While perhaps this was not how the defendant planned to spend the breakfast hour on October 24, 2005, there is simply no indicia that the agents' actions towards the defendant or his family were improper.  To the contrary, that Jones was "guarded by several heavily armed agents" is simply the standard, accepted procedure for executing a search warrant at the residence of an individual that a magistrate found probable cause to believe was a high-level cocaine trafficker.  Finally, a glance at Jones's criminal history makes clear that this was not his first encounter with the police (see generally Government's Motion for Admission of 404(b) and 609 Evidence); rather, his extensive criminal history of drug trafficking demonstrates his familiarity with his constitutional rights, including the right to refuse to consent, as explained to him by both S.A. Naugle and the consent to search form.

### 4.  The agents had independent probable cause to search the jeep

Even assuming *arguendo* that Jones involuntarily consented to the search of his Jeep, the agents had probable cause to search that Jeep at any time: (a) source information prior to the wire interception made clear that Jones was using his Jeep to transport large quantities of cocaine and cash; (b) confidential source information gained during the course of the wire interception made clear that Jones was continuing to use his Jeep to transport large quantities of cocaine and cash; (c) the wire interceptions indicated that Jones frequently drove to meetings with suspected cocaine customers in his Jeep; (d) in-person surveillance following those phone calls to arrange the meetings revealed that Jones did, in fact, drive his Jeep to meetings at which he exchanged cocaine and cash with his customers; (e) similarly, the GPS device, which was placed on Jones's Jeep on September 27, 2005, demonstrated that, following arrangements to meet with his Hispanic suppliers, Jones drove his Jeep to the suspected stash location, 9508 Potomac Drive, Ft. Washington, MD; and (f) in intercepted calls from the previous evening, October 23, 2005, Jones told many of his suspected customers that he was going to "make his rounds" because "it's here," and the GPS device confirmed that he did just that.  All of these facts, taken together, demonstrate ample probable cause that Jones was carrying contraband in the Jeep on the morning of October 24, 2005.[11]

---

[11]    That the agents later went the extra mile and obtained a warrant to more thoroughly search the car does not in any way obviate the determination that they had probable cause to enter the car at the time of the initial search.

5.  <u>The agents did not violate Federal Rule of Criminal Procedure 41(f)</u>

As noted above, once the agents completed their search of Jones's residence, and were leaving the premises, they left a copy of the warrant and the attachment, along with a copy of the search warrant return with Jones's wife, and explained to her what they were taking and why. This is all that Federal Rule of Criminal Procedure 41(f) requires, and thus his motion to suppress on this ground similarly fails.

Because the warrants themselves were valid and their execution was proper, the Court should reject the defendant's contentions that evidence seized during the searches of his home, his Jeep, and his nightclub Levels must be suppressed.

## IX.    MOTION TO SUPPRESS EVIDENCE OBTAINED FROM GLOBAL TRACKING DEVICE

The defendant has moved this Court to suppress the data obtained from a electronic tracking device – a GPS (Global Positioning System) – which was authorized pursuant to a court order by the Honorable Paul L. Friedman on September 16, 2005.  As grounds for suppression, the defendant claims that Special Agent Stephanie Yanta's affidavit in support of the application for GPS authorization lacked probable cause to believe that "the Jeep bearing MD tags M667480 was in any manner being used for criminal activity."  Def. Omnibus Mot. at 18.  Because Jones lacked a reasonable expectation of privacy in the whereabouts of his vehicle, the placement of the GPS device was proper, even in the complete absence of a court order.[12]

---

[12]    On July 23, 2006, 13 days after this Court ordered the defendants to file their pretrial motions, the defendant filed a supplemental motions to suppress the GPS on the additional grounds that (1) Judge Friedman's September 16, 2005, order had expired, and (2) that order did not authorize installation of the device outside the District of Columbia.  Setting aside

While the government obtained a court order from Judge Friedman as an extra layer of

precaution, the Fourth Amendment does not require it, and thus the agents were free to install the

GPS device even without such an order.  While the case law specific to GPS devices is limited,

given the technology's relatively recent vintage, those courts that have squarely confronted the

issue of whether or not a court order is required for the installation of a GPS device have

uniformly held that such court authorization is not required.  See United States v. McIver, 186

F.3d 1119, 1127 (9th Cir. 1999); United States v. Eberle, 993 F.Supp.794 (D. Mont.

1998); United States v. Moran, 349 F.Supp.2d 425, 467 (N.D.N.Y. 2005); cf. United States v.

Garcia, 2006 WL  1294579 * 3-5 (W.D. Wisc. 2006) (no warrant used; no concern regarding lack

of warrant; court finds that agents merely needed reasonable suspicion that defendant was using

vehicle in furtherance of criminal activity for placement of GPS tracking device).[13]

These decisions begin with the basic premise that individuals have significantly reduced

expectations of Fourth Amendment privacy in vehicles, because those vehicles serve largely as

transportation, and only rarely serve as a residence or place for storing personal effects.  John S.

_____

the issue that the defendant's filing was untimely, based upon a review of the GPS data, and the
defendant's supplemental motion, the government concedes that, though the violations of Judge
Friedman's September 10, 2005, Order were technical, they were indeed violations, and thus the
government confines its arguments to the issue of whether or not a court order was required, and
asserts that it was not.  See United States v. Gbemisola, 225 F.3d 753, 759 (D.C. Cir. 2000)
(issue was whether a warrant for installation of mobile tracking device on package, though
"perhaps invalid, was superfluous"; finding that warrant was indeed superfluous, and upholding
installation of device and admissibility of evidence derived therefrom).

[13]    While the Court did not decide this issue in United States v. Berry, 300
F.Supp.2d. 366, 367 (D.MD 2004), it raised concerns that the data stored by the GPS on the
defendant's vehicle in that case might be a product of a search and seizure such that the
protections of the Fourth Amendment are triggered.  However, because not only did the Court
not actually decide the issue, but also because the device in that case differed in significant
respects from the GPS device in this case, that case is irrelevant to this Court's present analysis.

Ganz,"It's Already Public: Why Federal Officers Should Not Need Warrants to Use GPS Vehicle

Tracking Devices," 95 J. Crim. Law & Criminology 1325, 1337-38 (Summer 2005) (hereinafter

"Ganz"), *citing* New York v. Class, 475 U.S. 106, 112-13 (1986) ("cars, unlike homes, are

subject to pervasive . . . continuing governmental regulation and controls, including periodic

inspection and licensing requirements. . . .  Police regularly stop and examine vehicles when

license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or

excessive noise . . . are noted, or if headlights or other safety equipment are not in proper

working order").  Further, as the Moran court noted, privacy expectations in a vehicle are further

diminished by the fact that they are available to "public scrutiny."  Moran, 349 F.Supp.2d at 467

(where law enforcement installed GPS on defendant's vehicle without a warrant, no Fourth

Amendment violation because "law enforcement personnel could have conducted a visual

surveillance of the vehicle as it traveled on the public highways"), *citing* United States v. Knotts,

460 U.S. 276, 281 (1983).

　　　These recent GPS cases follow the earlier cases regarding electronic tracking, including

Knotts, *supra*, and United States v. Karo, 468 U.S. 705 (1984), which dealt with "beeper"

devices that were installed inside containers which were secreted in vehicles.  In Knotts, the

agents tracked a container of suspected drug-making chemical, which was located in the

defendant's vehicle, to a cabin in a secluded area in Wisconsin.  Based thereon, they obtained a

search warrant, searched the cabin, and discovered both the container and a drug lab.  Knotts, 460

U.S. at 279.  In upholding the denial of the defendant's motion to suppress the drug lab evidence,

the Supreme Court held that:

> A person traveling . . . on public thoroughfares has no reasonable
> expectation of privacy in his movements from one place to another. When
> [the suspect] traveled over the public streets[,] he voluntarily conveyed to
> anyone who wanted to look the fact that he was traveling over particular
> roads in a particular direction, the fact of whatever stops he made, and the
> fact of his final destination when he exited from public roads onto private
> property. . . . Visual surveillance from public places along [target]
> Petschen's route or adjoining . . . [the premises in question] would have
> reveal[ed] all of these facts to the police. The fact that the officers . . .
> relied not only on visual surveillance, but also on the use of the beeper . . .
> does not alter the situation.

Ganz, at 1334, *quoting* Knotts, 460 U.S. at 281-282 (internal citations and quotations

omitted).

Similarly, in Karo, using a similar device, agents tracked to a house in Taos, New

Mexico, a container of a different chemical which they suspected of being used to extract cocaine

which was secreted in clothing. When they obtained and executed a search warrant based on this

information, they recovered contraband. Karo, 468 U.S. at 709-710. Addressing the appellants'

assertion that their Fourth Amendment rights were violated by the installation of the device, the

Court found that the installation of the beeper did not interfere with their possessory interests,

and was therefore not a search. Id. at 712, *cited in* Ganz at 1334. "At most, there was a technical

trespass on the space occupied by the beeper . . . {But] a physical trespass is only marginally

relevant to . . . whether the Fourth Amendment has been violated. Ganz at 1335, *quoting* Karo,

468 U.S. at 712-713. The Karo Court did, however, make a distinction between monitoring in

public, versus private, space, holding that, while the data obtained from the tracker while on the

public roads was admissible, that information that was obtained from the tracker while it was

inside the private residence was not, because the residents had a justifiable interest in privacy in

their home.  Karo, 468 U.S. at 715.[14]

Taken together, Knotts and Karo make clear that the installation of the GPS device on

Jones's Jeep on September 27, 2005, did not violate his Fourth Amendment rights.  Indeed, in

United States v. Gbemisola, our Court of Appeals relied on this line of cases in upholding the

warrantless installation and monitoring of a precursor device, a "mobile tracking device," on a

package in the defendant's possession.  225 F.3d 753, 759 (D.C. Cir. 2000) ("[i]n sum, because

no warrant was required for either the installation or use of the mobile tracking device, the fruits

of that use were admissible at trial, regardless of the validity of the warrant obtained by the

government").  In so ruling, the Court explained that "the device added nothing to what the

agents could see with their own eyes. . . . [And further that t]he decisive issue . . . is not what the

officers saw, but what they could have seen."  Id., citing Karo, 468 U.S. at 713-714, and Knotts,

460 U.S. at 282, 285.  Thus, they reasoned, "[a]s one cannot have a reasonable expectation of

privacy concerning an act performed within the visual range of a complete stranger," – in Jones's

case, the movement of his Jeep on public thoroughfares – "the Fourth Amendment's warrant

requirement was not violated."  Id., citing Katz v. United States, 389 U.S. 347, 351 (1967)

("What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment

---

[14]     While this may very well mean that the data obtained from the tracker when the
Jeep was parked in the garage attached to Jones's Moore Street home should be suppressed, as a
practical matter, this has little impact on the government's proof at trial.  Under Karo, the
government will be able to present evidence from the GPS as it moved down Moore Street,
nearing his home, which the government will argue is sufficient to show where Jones was, for
example, in the hours before the search warrant was executed on his home in the early morning
hours of October 24, 2005.  See generally Ganz, supra, at 1328-1330, for a fuller explanation of
how beepers and GPS devices work (beepers are passive radio transmitters which neither store
nor collect data, but rather permit real-time tracking; GPS devices utilize a network of at least 24
satellites, which pinpoint the device's longitude and latitude at a precise time, information which
the GPS then stores in memory).

protection").

### X. MOTION TO SUPPRESS TANGIBLE EVIDENCE FROM THE GREEN HONDA ODYSSEY MINI-VAN

Jones finally moves this Court to suppress evidence seized from of his Honda Odyssey minivan in North Carolina, on April 5, 2005.  On that date, the Highway Interdiction Unit of the Durham, North Carolina Police Department conducted a traffic stop of Jones's 1997 Honda Odyssey mini-van, which was being driven by Lawrence Maynard and also occupied by another individual in the front passenger seat.  Maynard and the passenger were questioned separately by the Interdiction Team, and each gave conflicting stories regarding where they were headed and why.  Based on these differing explanations and Maynard's fidgety behavior, one of the officers asked Maynard for consent to search the van, which Maynard granted.  Prior to the execution of the consensual search, a certified interdiction unit canine was called to the scene, and alerted on the right rear passenger area of the mini-van.  A search of the mini-van revealed a hidden compartment in the van, which contained six white plastic Target shopping bags, containing a total of $67,115.00 in U.S. currency, in various denominations, held together by rubber bands.  When interviewed by the Interdiction Unit, both Maynard and his passenger denied any knowledge of the secret compartment and the money contained therein.  The Honda Odyssey was impounded, the $67,115.00, was seized as evidence, Maynard received a warning ticket, and then was released without additional charges.  In the intervening 15 months, no one has come to claim the minivan.  For the following reasons, the defendant's motion fails.

A.     **Jones lacks standing to challenge the search of the minivan.**

As an initial matter, Jones does not have standing to challenge the search of his minivan, which Maynard was driving in North Carolina, because at the time of the search, he had no reasonable expectation of privacy in his vehicle which he had loaned to another.  See, e.g., United States v. Fuller, 374 F.2d 617, 622 (8th Cir. 2004).  In Fuller, a case strikingly similar to the case at bar, officers observed the defendant and what later turned out to be his stepson talking inside two side-by-side vehicles: a sedan driven by Fuller and a van driven by the stepson.  At one point, the officers observed Fuller open the trunk of the sedan, retrieve a large plastic bag, and hand it to his stepson.  The stepson put the bag in the van and drove off.  Moments later, when the stepson was stopped, an officer detected the scent of marijuana coming from the car and asked the stepson for permission to search the van.  The stepson granted permission, and recovered from the van was a large plastic bag containing marijuana, crack cocaine, over $2,000, in cash, live rounds of ammunition, and an electronic scale.  Fuller moved to suppress the evidence, claiming among other things, that the stop and the search violated his Fourth Amendment rights.  In upholding the District Court's denial of the motion to suppress, the Court found that, although Fuller did have a "substantial property interest" in the van, because he had "entrusted the van to another person," he gave up any reasonable expectation of privacy in it for the time that the van was in the exclusive possession of his stepson.  Id. at 621-622.  See also, United States v. Powell, 929 F.2d 1190, 1196 (7th Cir.), cert. denied, 502 U.S 981 (1991) (defendant pickup truck owner did not have legitimate expectation of privacy in pickup truck being driven by another over 1,000, miles away); United States v. Elmore, 304 F.3d 557, 560-561 (6th Cir. 2002), (even if defendant were the owner of the car, a disputed issue, his Fourth

57

Amendment rights were not infringed by the stop and search because he was not in the car when it was stopped); United States v. Dall, 608 F.2d 910, 914-915 (1st Cir. 1979), *cert. denied*, 445 U.S. 918 (1980) (defendant's Fourth Amendment rights were not violated when his pickup truck, which was being driven by another, and which he did not occupy, was searched; "ownership alone is not enough to establish a reasonable and legitimate expectation of privacy. . . .  The already diminished expectation of privacy that attaches to motor vehicles is still further attenuated when the owner had given over possession to another for the other's own uses to the temporary exclusion of the owner"); cf. United States v. Free, 437 F.2d 631, 635 (D.C. Cir. 1970) (in case where defendant was not owner of car, but was arrested therein, the owner's "Fourth Amendment rights were not violated when the police, with . . . justification . . . made a warrantless search of those portions of the car which the owner had delivered access and control to others").

## B.    **Maynard had authority to consent and indeed did consent.**

By contrast, the person with "standing" to both consent to the search, or conversely to challenge its legitimacy in a motion to suppress, was Lawrence Maynard. Courts have held that the question of "whether the driver of a car has the reasonable expectation of privacy necessary to show Fourth Amendment standing is a fact-bound question dependent on the strength of his interest in the car and the nature of his control over it; ownership is not necessary." United States v. Baker, 221 F.2d 438, 442 (3rd Cir. 2000).  The same analysis applies here to the question of whether Maynard had the authority, the standing, to consent to the search of the Honda Odyssey minivan registered to Antoine Jones – did Lawrence Maynard have a reasonable expectation of privacy in that minivan, which he could legitimately waive by giving such consent?  See

generally Illinois v. Rodriguez, 497 U.S. 177 (1990); United States v. Matlock, 415 U.S. 164 (1974) (Fourth Amendment permits a warrantless search based on the consent of an occupant who shares authority over area in common with a co-occupant, who later objects to the use of evidence obtained in that search).

In United States v. Beshore, 961 F.2d 1380, 1382 (8th Cir. 1992), the defendants were convicted of attempting to manufacture methamphetamine. They appealed the trial court's denial of their motion to suppress evidence seized during a consensual search of one of their vehicles, while it was in the possession of a girlfriend who, they claimed, lacked the authority to consent to the search. In upholding the denial of the suppression motion, the Court held that "third-party consent is valid when permission to search was obtained from a third-party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." Id., quoting Matlock, 415 U.S. at 171 (internal citation, quotation and footnote omitted). It therefore did "not matter that [the girlfriend] was not the owner of the car which was searched. . . . [B]y having [the defendant's] permission to use the car . . . [she] had common authority over the vehicle. [The defendant] thus assumed the risk that [she] would permit the vehicle to be searched." Id.

Here, Lawrence Maynard was driving a minivan in North Carolina when he was stopped. It was clear from the documents in the van that it was registered to someone in Maryland, which is where Maynard claimed to be coming from. Indeed, throughout the questioning regarding where he was coming from and where he was going to, he gave no indication that he lacked the authority to drive the car, nor does Jones now claim that he lacked that authority. The officers' search of the minivan, based on Maynard's consent, was valid. See Baker, 221 F.3d at 442,

*citing, inter alia,* <u>United States v. Angulo-Fernandez</u>, 53 F.3d 1177, 1179 (10th Cir. 1995) (driver who was able to produce registration papers in the name of the person from whom he claimed to have borrowed the car had standing); <u>United States v. Rubio-Rivera</u>, 917 F.2d 1271, 1275 (10th Cir. 1990) (permission from the owner to use a vehicle supports privacy expectation therein); <u>United States v. Garcia</u>, 897 F.2d 1413, 1417-18 (7th Cir. 1990) (driver using vehicle with the permission of an absent owner has a reasonable expectation of privacy therein); <u>United States v. Ponce</u>, 947 F.2d 646, 649 (2d Cir. 1991) (defendant must show legitimate basis for possessing the car, such as permission from the car owner, to have standing); <u>United States v. Cooper</u>, 133 F.3d 1394, 1398-99 (11th Cir. 1998) (driver of rental car whose contract to rent the car had expired four days before the search of the car had a reasonable expectation of privacy in the car because he could have extended the contract with a single phone call).

### C.     The narcotics-sniffing canine alert provided independent probable cause to <u>search the minivan.</u>

Even assuming *arguendo* that Jones is correct in his contention that Maynard lacked standing to consent to the search of the minivan, he cannot challenge the independent probable cause basis for the search – the canine hit.  Indeed, he doesn't even try.

In light of the canine's training and certification, his bark established probable cause to believe that their were narcotics in Jones's minivan.  Courts have accepted dog sniff evidence for over one hundred years.  <u>See</u>, <u>e.g.</u>, <u>Blair v. Commonwealth</u>, 204 S.W. 67 (Ky. Ct. App. 1918) (collecting cases).  Our Court of Appeals has specifically held that the actions of a trained dog provide probable cause for a search.  <u>United States v. Tartaglia</u>, 864 F.2d 837, 840 & 842 (D.C. Cir.1989) (probable cause to search train roomette when dog "scratched" at door and whined);

United States v. Fulero, 498 F.2d 748, 749 (D.C. Cir. 1974) (dog's indication of narcotics established probable cause to search a foot locker).

Other courts as well have repeatedly stated that a trained dog's reaction to the scent of narcotics provides probable cause to search an automobile.  See, e.g., United States v. Jeffus, 22 F.3d 554, 557 (4th Cir. 1994) ("When dog 'alerted positive' for the presence of drugs, the officer was given probable cause for the search that followed."); United States v. Seals, 987 F.2d 1102, 1106-07 (5th Cir. 1993) (dog alert gives probable cause to search vehicle); United States v. Hernandez, 976 F.2d 929, 930 (5th Cir. 1992) ("Once the dog alerted [officer] had probable cause to search the car"); United States v. Hill, 195 F.3d 258, 263 (6th Cir. 1999) (trained dog scratching and biting gave probable cause to search vehicle); United States v. Navarro-Camacho, 186 F.3d 701, 706  (6th Cir. 1999) ("A positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance"); United States v. Diaz, 25 F.3d 392, (6th Cir. 1994) (probable cause to search car where dog that was trained to bite, bark, and scratch only scratched); United States v. Jones, 275 F.3d 648, 653 (7th Cir. 2001) (dog alert provided probable cause to search vehicle); United States v. Morgan, 270 F.3d 625, 628-29 (8th Cir. 2001) (trained dog biting and scratching at door provided probable cause to search vehicle); United States v. Munroe, 143 F.3d 1113, 1116 (8th Cir. 1998) (dog alert provided probable cause to search vehicle); United States v. Carrazco, 91 F.3d 65, 67 (8th Cir. 1966) (dog alert provides probable cause to search vehicle); United States v. Garcia, 205 F.3d 1182, (9th Cir. 2000) (certified drug dog's alert gave probable cause to search vehicle); United States v. Guerrera, 554 F.2d 987, 989 (9th Cir. 1977) (dog trained to alert to narcotics by scratching provided probable cause to search vehicle by "'alerting'" on back seat and bags in trunk); United States v.

61

Robinson, 2001 WL 912859 at *7 (10th Cir. 2001) (trained dog's "alert" to presence of narcotics

established probable cause to search vehicle); United States v. Klinginsmith, 25 F.3d 1507, 1510

(10th Cir. 1994) (dog alert provided probable cause to search vehicle); United States v. Ludwig,

10 F.3d 1523, 1527 (10th Cir. 1993) ("We therefore have held in several cases that a dog alert

without more gave probable cause for searches and seizures."); United States v. Chavira, 9 F.3d

888, 890 (10th Cir. 1993) ("When the dog indicated the presence of narcotics [in vehicle],

[officer] had probable cause to conduct a search."); United States v. Holloman, 113 F.3d 192,

194 (11th Cir. 1997) (dog sniff provided probable cause to search truck); United States v.

Robinson, 2000 WL 970667 at *2 & 5 (D. Kan. June 26, 2000) (dog alert at tailgate provided

probable cause to search vehicle); United States v. Neatherlin, 66 F.Supp.2d 1157, 1160 (D.

Mon. 1999) ("a canine sniff alone supplies probable cause to search, provided that the dog is

reliable."); United States v. One 1992 Isuzu Trooper, 51 F.Supp.2d 1268, 1271 (M.D. Ala. 1999)

("drug-sniffing dog then alerted on the car providing the officers with probable cause to

search."); United States v. Nova-Nunez, 1997 WL 83289 at * 3 (S.D.N.Y. Feb. 16, 1997) (dog's

alert for narcotics provided probable cause to search vehicle's trunk); United States v. Taylor,

955 F.Supp. 763, 769 (E.D. Mich. 1997) ("'alert' by a dog is sufficient to constitute probable

cause for an arrest or search"); United States v. Hare, 932 F.Supp 843, 847 (E.D. Tex. 1996)

(probable cause to search vehicle based on dog becoming "tense" and "scratching"); United

States v. Kopp, 1994 WL 186034 (D. Kan. April 14, 1994) (dog alert to U-Haul trailer provided

probable cause to search).

Having probable cause to believe that there were narcotics in the defendant's vehicle, the officers had the right to seize it and search it in its entirety, and thus, Jones's motion to suppress the evidence found in the Honda Odyssey should be denied.  United States v. Ross, 456 U.S. 798, 825 (1982) (police may search every part of a vehicle and container within the vehicle that may conceal the object of the search if they have a generalized belief that the vehicle contains contraband somewhere inside); United States v. Harwood, 998 F.2d 91, 97 (2nd Cir. 1993) (warrantless search of door panels permissible as LSD in blotter form can be stashed anywhere in vehicle); United States v. Bullock, 94 F.3d 896, 899 (4th Cir. 1996) (officer could forcibly remove secret compartment under back seat because he had probable cause to believe that car contained contraband); United States v. Zucco, 71 F.3d 188, 191-92 (5th Cir. 1995) (warrantless search of entire recreational vehicle including dismantling of vehicle wall permissible because probable cause to believe cocaine present); United States v. Lumpkin, 159 F.3d 983, 986 (6th Cir. 1998) (warrantless search of locked trunk and engine compartment valid because officer had probable cause to search entire vehicle for drugs); United States v. Thornton, 197 F.3d 241, 247-49 (7th Cir. 1999) (warrantless search of hidden compartment in vehicle permissible where probable cause to search vehicle existed); United States v. Sample, 136 F.3d 562, 564 (8th Cir. 1997) (warrantless search of dashboard compartment valid because officer had probable cause to believe vehicle transporting contraband).

## XI.    <u>CONCLUSION</u>

**WHEREFORE** the United States respectfully submits, that as set forth above, Jones's several motions in this matter should be denied.

Respectfully submitted,
KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY


By: _____
RACHEL CARLSON LIEBER
Assistant United States Attorney
D.C. Bar No. 456-491
555 4th St. N.W. Room 4820
Washington, D.C. 20530
(202) 353-8055

By: _____
JOHN V. GEISE
Assistant United States Attorney
D.C. Bar No. 358-267
555 4th St. N.W. Room 4126
Washington, D.C. 20530
(202) 616-9156